**MASTEC NORTH AMERICA, INC. and Mastec, Inc., Appellants,**

**v.**

**EL PASO FIELD SERVICES, L.P. and Gulfterra South Texas, L.P. f/k/a El Paso South Texas, L.P., Appellees.**

No. 01–07–00319–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 6, 2010.

Reconsideration En Banc Denied July 16, 2010.

432

Bruce E. Ramage, Levon G. Hovnatanian, Martin, Disiere, Jefferson & Wisdom, L.L.P., Timothy W. Strickland, Fowler, Rodriguez, Chalos, Flint, Gary, McCoy, O'Connor, Sullivan & Carroll, L.L.P., Houston, TX, for Appellants.

David M. Gunn, John S. Adcock, Murray Fogler, Beck, Redden & Secrest, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION ON REHEARING

LAURA CARTER HIGLEY, Justice.

This is a breach of contract dispute brought by appellants, MasTec North America, Inc., and MasTec, Inc. (collectively, "MasTec"), against appellees, El Paso Field Services, L.P. and Gulfterra South Texas, L.P., f/k/a El Paso South Texas, L.P. (collectively, "El Paso"). El Paso engaged MasTec to replace a butane pipeline for a lump sum of $3.6 million, known as the "Butane Shuttle Replacement Project" ("Project"). MasTec submitted its bid on the Project based on information in El Paso's bid package, which included, inter alia, the "Station and Land Pipeline Construction Contract" ("Contract") and El Paso's specifications, which were incorporated into the Contract. In the Contract specifications, El Paso asserted that it used due diligence in locating any "foreign crossings"[1] in the pipeline right-of-way and that there were 280 such crossings. During construction, however, MasTec encountered 794 foreign crossings, which required additional construction measures and increased its costs substantially. MasTec sued El Paso to recoup the additional expenses. A jury found that El Paso breached the due diligence provision of the

Contract specifications and awarded $4,763,890 in damages to MasTec. Subsequently, on the motion of El Paso, the trial court granted judgment notwithstanding the verdict ("JNOV") in favor of El Paso, concluding that the lump-sum provisions of the Contract allocated the risk of unidentified foreign crossings to MasTec and holding that MasTec take nothing by its claims. MasTec appeals.

In its sole issue, MasTec contends that the trial court erred by granting JNOV in favor of El Paso because the trial court's interpretation of the Contract improperly rendered the due diligence provision a nullity and shifted the risk of costs associated with unidentified foreign crossings to MasTec. In the alternative, MasTec contends that (a) the Contract is ambiguous and must be strictly construed against El Paso, or (b) that MasTec is entitled to recover under its quantum meruit theory.

On July 23, 2009, we reversed and remanded for entry of judgment consistent with the jury's verdict and for assessment of attorney's fees in favor of MasTec. El Paso moved for rehearing. We grant the motion, withdraw the opinion dated July 23, 2009, and issue this opinion in its stead. Our disposition and judgment remain unchanged.

We reverse and remand for entry of judgment consistent with the jury's verdict and for assessment of attorney's fees in favor of MasTec.

## FACTS AND PROCEDURAL HISTORY

El Paso is one of the world's largest energy companies. MasTec is a construction company that was established in the

---

1. "Foreign crossings" are obstacles that cross the pipeline right-of-way—such as other pipelines, utilities, roads, rivers, fences, wells, cables, and concrete structures.

1930s and has annual gross revenue exceeding $1 billion.

At the time of the events, El Paso owned a butane pipeline that extended from Houston to Corpus Christi. The pipeline was originally constructed in the 1940s as an emergency supply line during the war. Because of its age and because it was deemed too shallow (buried less than 12 inches underground), El Paso contracted for its replacement, which took place in phases. This lawsuit involves Phase II of the replacement—a 68–mile, 8–inch diameter line extending from Victoria to Nueces Bay.[2]

El Paso invited MasTec to bid on the replacement Project, which was to include removal of the existing pipeline and the construction of a new pipeline in the same location. MasTec hired Bill White, who is considered by MasTec to be "a pipeline-construction veteran," as its general manager. White attended El Paso's "pre-bid meeting" on April 22, 2003, at which El Paso distributed bid packages containing the job description, the location of the pipeline, drawings or maps, known as "alignment sheets," and the Contract.

According to El Paso's bidding instructions, "The Contractor's bid shall be based on the Contract documents as issued, without modifications. All clarifications or changes during the bid period will be communicated to all Contractors. . . . Significant exceptions to the provisions of the Proposed Contract documents may cause rejection of the bid. . . . The Scope of Work is believed to be complete."

The purpose of the alignment sheets was to show "foreign crossings," which are ob-

stacles that cross the pipeline right of way—such as other pipelines, utilities, roads, rivers, fences, wells, cables, and concrete structures. Substantial costs are involved in maneuvering around these structures during pipeline construction and de-construction. El Paso had hired Gullett & Associates, an engineering company, to produce the alignment sheets.

The invitation to the pre-bid meeting stated, "No guided tour of the proposed pipeline is now scheduled. Each contractor will be required to review the construction requirements individually. Aerial inspection is highly recommended." At the meeting, Jackie Ross, who was initially a consultant to El Paso and later became the full-time assistant to the project manager on this Project, told the contractors that El Paso would normally conduct a tour of the pipeline, but that there would be too many cars in this case and that each of the contractors was encouraged to "fly the route."

After the pre-bid meeting, White and his son, Mike, flew by helicopter over the pipeline route, familiarizing themselves with the topography and landing several times to check soil conditions. Mike testified by deposition that he carried the alignment sheets in his lap during the flight for orientation, but that he could not see foreign crossings from the air. White also drove along portions of the pipeline to which he had access. According to White, MasTec and the other contractors were specifically prohibited from entering certain private properties along the route, including the O'Connor Ranch. El Paso later claimed that the contractors were

---

**2.** Although MasTec was asked to bid on the end of the segment of this line, that lying between Midway Station and Nueces Bay, the work on that segment was considered "Optional" (in that it was "to be performed by [MasTec] at [El Paso's] sole discretion") at the time of the bid proposal. The segment constituted new construction that depended on whether El Paso could successfully acquire the necessary right-of-way easements. Ultimately, MasTec performed this work.

permitted to enter the restricted areas for inspection if they arranged for an escort by an El Paso representative.

Pursuant to El Paso's written bidding instructions, MasTec's bid and completed Contract, including lump-sum price schedule, were due 12 business days later, on May 8, 2003. This date was later amended to May 15, 2003.

*The Contract and Specifications*

The Contract, which MasTec was to sign and submit with its bid, provides as follows, in pertinent part:

2.1 SCOPE OF WORK

[MasTec] agrees, at its cost, that it shall (except as otherwise provided for in the Contract or Drawings) furnish all necessary materials, supplies, labor, tools, equipment superintendence, apparatus and machinery, including without limitation, transportation and all other items necessary to perform the Work for the construction and completion of, and shall construct, install, complete, and deliver to [El Paso] in a good and workmanlike manner, in strict compliance with the Contract and all applicable laws, rules, regulations, ordinances and permits, all of the Work set forth in Exhibit "A," "Scope of Work and Addendums" (attached hereto), all in accordance with the provisions of this Contract.

. . . .

4.1 COMPENSATION

For and in consideration of the performance of the Work by [MasTec] and subject to the terms and conditions of this Contract, [El Paso] agrees to pay and [MasTec] agrees to accept compensation as set forth in the attached Exhibit "B–1," Contract Price Schedule.

. . . .

4.6 COMPENSATION FOR DELAYS IN PERFORMANCE OF WORK

a) By [MasTec]: All delays in the performance of the Work resulting from causes other than those attributable to [El Paso] shall be at the cost and expense of [MasTec]. . . .

b) By [El Paso]: For delays in the performance of the Work attributable to [El Paso], it is agreed that the compensation and/or amounts due [MasTec] in full and complete settlement of such delays shall be as follows: [various lump sum settlement or reimbursement options].

. . . .

7.1 REPRESENTATIONS AND WARRANTIES

. . . .

e) [MasTec represents] [t]hat its duly authorized representative has visited the site of the Work, is familiar with the local and special conditions under which the Work is to be performed and has correlated the on site observations with the requirements of the Contract and has fully acquainted itself with the site, including without limitation, the general topography, accessibility, soil structure, subsurface conditions, obstructions and all other conditions pertaining to the Work and has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work, and that anything in this Contract or in any representations, statements or information made or furnished by [El Paso] or any of its representatives notwithstanding, [MasTec] assumes full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings and all risks in connection therewith;

f) That it possesses a high level of experience and expertise in the business,

administration, construction management and superintendence of projects of the size, complexity and nature of the Work and that it will perform the Work with the care, skill and diligence of such a Contractor;

g) That the Contract is sufficiently complete and detailed for [MasTec] to perform the Work required to produce the results intended by the Contract and comply with all the requirements of the Contract; ...

8.1 CONTRACTOR'S CONTROL OF THE WORK

a) . . . .

. . . .

7. [MasTec] represents that it has had an opportunity to examine, and has carefully examined, all of the Contract documents and has fully acquainted itself with the Scope of Work, design, availability of materials, existing facilities, the general topography, soil structure, substructure conditions, obstructions, and all other conditions pertaining to the Work, the site of the Work and its surroundings; that it has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work; and that anything in any of the Contract documents or in any representations, statements or information made or furnished by [El Paso] or its representatives notwithstanding, [MasTec] will regardless of any such conditions pertaining to the Work, the site of the Work or its surroundings, complete the Work for the compensation stated in this Contract, and pursuant to the extent of [MasTec's] liability under this Contract, assume full and complete responsibility for any such conditions pertaining to the Work,

the site of the Work or its surroundings, and all risks in connection therewith. In addition thereto, [MasTec] represents that it is fully qualified to do the work in accordance with the terms of this Contract within the time specified.

. . . .

24.1 EXHIBITS

The following Exhibits are included herein by reference, are attached hereto and shall become a part of this Contract for all purposes:

. . . .

Exhibit "B–1" Contract Price Schedule

. . . .

Exhibit "C" Construction Specifications

. . . .

25.1 ORDER

. . . .

b) ... The Specifications, Drawings, Exhibits, and all supplemental documents are essential parts of the Contract, and a requirement appearing in one is as binding as though appearing in all. They are intended to be complementary, to describe and provide a complete Work.

. . . .

28.1 AGREEMENT

This Contract, together with all Exhibits and attachments, constitutes the entire Contract agreement between the parties relating to its subject matter and no other conversations, bid, memoranda or other matter between the parties relating to the subject matter of this Contract, oral or written, exchanged before execution of this Contract shall vary, alter or be used to interpret the terms of this Contract.

Pursuant to Exhibit B–1 of the Contract, "Contractor's Proposal," MasTec agreed to perform "everything necessary to complete, satisfy, and discharge all Work and obligations imposed on [MasTec] connected with the performance of the Work," including, as follows:

Furnish all labor, equipment and materials as described in the Specifications for all Work necessary to perform the following applicable Work as shown on the Drawings, including but not limited to: loading, hauling, unloading, storing, clearing, excavating, including rock if encountered, cutting and beveling of pipe; installing pipe or valves, where required; removing pipe or valves, where required; welding (including tie-in and transition welds, if required); coating, repairing coating, furnishing and installing padding when applicable; installing concrete supports; blow-offs, bypasses, bolting, bracing hydrostatic testing of completed assemblies, painting of newly installed piping assemblies and cleanup.

. . . .

Any Work required to complete installation of the new pipeline but not shown as a pay item is no less included in the scope of work for installation of the new 8–inch Butane Shuttle pipeline and is included in [MasTec's] lump sum proposal. Just because an item of Work is not specifically identified, does not mean such Work is not included in [MasTec's] scope of Work. Any item of Work [MasTec] knows is required for completion of the installation but not specifically identified is to be included in [MasTec's] Lump Sum Proposal.

Exhibit C of the Contract provided the "Construction Specifications." At Specification LP–1, "General Conditions," the Contract provides that, "Unless otherwise specified, [El Paso] will furnish only basic reference lines and bench marks from which [MasTec] shall establish such other points as it may need." Specification LP–5, states, in relevant part, that El Paso "will have exercised due diligence" in locating foreign crossings and that MasTec "shall confirm" the location of the crossings during construction before actually digging or drilling, as follows:

2. COMPANY FOREIGN LINE AND UTILITY CROSSINGS

The Company will have exercised due diligence in locating foreign pipelines and utility line crossings. However, the contractor shall confirm the location of all such crossings and notify the owner prior to any ditching activity in the vicinity of the crossings. . . .

Specification LP–17 similarly provides, as follows:

2. FOREIGN LINE AND UTILITY CROSSINGS

The Company will have exercised due diligence in locating foreign pipelines and/or utility line crossings. However, the Contractor shall confirm the location of all such crossings and notify the owner prior to any HDD[3] activity in the vicinity of the crossings. Contractor shall be responsible for all damages to foreign pipelines and/or utility line crossings during HDD operations. Contractor shall repair damaged foreign pipelines and/or utility line crossings to original or better condition and meet Company approval. In all cases, foreign pipelines, utility line crossings and/or structures take precedence over Company tolerances.

---

3. Pursuant to paragraph 1 of specification LP–17, the acronym "HDD" means horizontal directional drilling.

*The Bid*

White, on behalf of MasTec, submitted a completed Contract, per El Paso's bidding instructions, and a bid of $3,619,960, which included the removal of the old pipeline and construction of the new pipeline. White included a standard 15 percent contingency in the bid for unidentified foreign crossings.

After El Paso reviewed the bids submitted by the various contractors and narrowed its choices to MasTec and one other contractor, El Paso called a meeting with White. According to White, he and El Paso went over scheduling, manpower, equipment, and projected production rates to ensure compliance with El Paso's time-frame.[4] According to Ross, he and other representatives from El Paso discussed with White that MasTec's bid was substantially lower than the bids submitted by other contractors and that MasTec would be permitted to withdraw its bid if it so chose. White disputes that he was ever told that MasTec's bid was low or that MasTec was being given the choice to withdraw. Ultimately, El Paso accepted MasTec's bid.

*The Contract is Executed and Work Begins*

Work on the Project was to commence June 9, 2003 and to be completed on October 1, 2003. Commencement was delayed because El Paso had permitting issues and had not yet finalized the purchase of work space along the right-of-way from some of the landowners. Nevertheless, work began in the early part of June.

*The Dispute*

It is undisputed that, after construction began, MasTec was required to confirm the exact locations of the foreign crossings that El Paso had identified to avoid cutting through the crossings. MasTec began to encounter numerous foreign pipeline crossings that were not on El Paso's alignment sheets. MasTec hired Steve Edwards to locate the foreign crossings.

Edwards testified by deposition read to the jury that foreign pipeline crossings represent a significant safety hazard during pipeline construction. Each crossing must be treated as a "live" line, that is, "something that is going to explode if you hit it." Edwards employed a metal detector device, known as an "M-scope," to find the foreign crossings. Edwards explained that the M-scope is designed to locate metal pipelines, as well as PVC and fiberglass pipelines that contain metal tracers. The M-scope is not designed to locate pipelines that do not contain metal or metal tracers. To find PVC and fiberglass pipelines, Edwards talked with adjacent landowners and pipeline operators; used a crew of up to 20 men to probe the ground with metal rods and shovels, and to dig trenches five feet deep; used hydraulic vacuums to pressure wash the holes; and marked the pipelines with stakes and red tape. Edwards said that he located an "extreme amount" of non-metal foreign crossings and that MasTec was forced to hire an additional M-scope crew to keep up with the pipeline strippers.

Edwards testified that it was not unusual to find five to ten percent more foreign crossings than those identified on the alignment sheets by the pipeline owner. In this case, however, he found "approximately 1000" foreign crossings that were not on El Paso's alignment sheets. Most of the unidentified foreign crossings were located on the O'Connor Ranch. Edwards

4. The Contract specifies that the pipeline must be operational by August 15, 2003. The jury heard testimony that El Paso faced owing penalties to a third party of up to $250,000 per day if the deadline was not met.

said that El Paso had refused to assist them in locating the lines.

Greg Floerke, senior vice president of MasTec's Communications Group, explained that each time MasTec found a new foreign crossing, it slowed production down and efficiency was lost. MasTec had to stop the assembly line to excavate, remove soil from around the crossing, lay the pipe, make special bends, and weld each end. Edwards explained that, because of the close proximity of the other El Paso pipeline and the Valero pipeline in the same right-of-way, each of these "tie-ins" that were created to go around the foreign crossing required that special OSHA-approved manholes be created so that a welder could safely go down and perform the welds. In addition, cutting crews and X-ray crews had to go down in the holes. Further, there was a lot of sink water that had to be pumped out.

According to Edwards, the situation was exacerbated by the fact that, during construction, the area was hit with two hurricanes and 50 to 60 inches of rain that flooded the area, filled the pipeline ditches with silt, and knocked out all of Edwards's stakes marking the previously unidentified plastic and fiberglass crossings. Edwards explained that, had El Paso's alignment sheets been accurate, the crews could have followed the sheets, walked back to the crossings, and resumed work once the weather stopped. Instead, Edwards was forced to re-survey and re-stake the foreign crossings in the right-of way. Edwards said that the crews spent days digging fruitlessly looking for lines.

Ultimately, according to Edwards, it was a representative from Valero who offered the most assistance. El Paso had sold a 12–inch pipeline in the same corridor to Valero that ran parallel to the pipeline at issue in the instant suit. Edwards testified that Valero's alignment sheets contained many of the plastic and fiberglass crossings that he was finding.

According to Edwards, of those foreign crossings that Gullett had staked, several were mis-marked, were 20 to 30 feet off their exact locations, and had to be relocated. Edwards testified that, ultimately, Gullett came out to the site and followed behind Edwards, recording the foreign pipeline crossings that Edwards and his crews had located.

Greg Perkins, a mechanical engineer testifying as an expert for MasTec, said that he found quite a disparity between El Paso's for-bid drawings and the as-built drawings. Perkins said that the Contract required El Paso to use due diligence in locating the foreign crossings; that MasTec depended on El Paso's statement of the foreign crossings; and that the level of El Paso's inaccuracy "was catastrophic." With all of the other pipelines in the same route as the subject pipeline, El Paso "should have had a better handle on the number of foreign crossings that were actually there." Perkins explained that El Paso could have contacted landowners and operating companies. Perkins testified that MasTec located 794 foreign crossings and that over 200 of those crossings were actually metal pipelines that had not been identified on El Paso's alignment sheets.

John Reitzell, assistant project manager for MasTec, took over the Project after White was let go on November 19, 2003. Reitzell testified that the crews were having to pressure wash to find the lines and that Valero's drawings of the foreign crossings over its parallel pipeline were much more accurate and included the plastic lines. According to Reitzell, it took a crew about 10 hours to perform a single tie-in. Reitzell testified that MasTec could have accepted a variance of five percent on the foreign crossings, but that there were three times as many foreign crossings as

indicated on El Paso's alignment sheets. In addition, Reitzell explained that the "take up" crew that worked to pull up the old pipeline found it located at depths of six to seven feet underground. According to Reitzell, El Paso had told MasTec that the pipeline was buried no more than 12 inches in the ground.

With regard to the duties under the Contract, Floerke testified that the Contract placed the responsibility on El Paso to apply due diligence in locating and correctly identifying foreign crossings and that MasTec's responsibility was to verify those crossings before digging. Floerke testified that the issue is timing. First, El Paso's duty to use due diligence in determining the extent and location of foreign pipelines arose. Then, after the bid was awarded, the contract was complete, and the crews were out in the field constructing the line, MasTec's duty arose to verify the foreign crossings before actual excavation.

Danny Dial, a forensic engineer testifying for MasTec, explained that "due diligence," in the present context, means that the operating company is telling the pipeline contractor that they have been diligent in locating all the foreign crossings and will provide the information to the contractor. Dial testified that the industry custom or practice is that, before soliciting bids for pipeline construction, operating companies (1) gather any "one-call" [5] information in their catalog; (2) send out a survey crew; and (3) send their landmen to talk with the landowners from whom the company obtained its right-of-way easements because the landowners are the best source of information regarding any other easements that have been granted to other pipeline operators in the same area.

Dial explained that, because there was an existing Valero pipeline in the same right-of-way [6] and parallel to the subject pipeline, "it would have been prudent for El Paso to contact Valero and compare as-built drawings to see if they were aware of other foreign crossings in that area."

Dial explained that when a lump-sum agreement is made between an operating company and a contractor, the contractor is necessarily placing a tremendous amount of trust in the specifications that the operating company submits to the contractor for the bid. The contractor cannot see what is physically underground and has to rely on information given by the operator. Here, El Paso specifically placed in the Contract assurances that it had exercised due diligence in locating any foreign crossings. El Paso owns the line, controls the easement, and has access to what crosses through the area.

Ross, of El Paso, testified that El Paso hired the survey company, Gullett & Associates, to survey the line, to use metal detectors, and to "try to locate any pipeline that they can, anything visible," such as line markers. Ross testified that El Paso had the preliminary alignment sheets that were created in the 1940s for the pipeline at issue, but that he could not recall having seen any as-built alignment sheets. Ross testified that the alignment

---

5. According to the record, "one call" is a centralized notification system in Texas that began in the 1990s. Every utility line that goes into the ground 16 inches or greater must be reported when the line is being laid. The contractor makes one call which notifies all the registered, affected pipeline operators in the area that they have 48 hours to send out a representative to be "on site" while new pipeline is laid over theirs. The representative records the new pipeline information in his own catalog for future reference with regard to repair or replacement of his own line.

6. The record reflects that El Paso sold this pipeline to Valero.

sheets came from the operating company, Coastal, from whom El Paso had purchased the pipeline, that the sheets "were very poor," "very inadequate," and would not have shown any of the crossings that were installed after the 1940s. Ross said that he did not believe that the alignment sheets were ever updated. When asked if he had seen the alignment sheets for Valero's line, Ross replied that he did not recall having had access to them. Ross testified that he did not instruct Gullett to attempt to locate or mark any PVC or fiberglass lines unless such lines could be seen "by something visual." Ross further stated that he did not inquire whether El Paso had any "one call" information cataloged and did not attempt to contact any of the landowners or other operating companies along the pipeline route. Ross asserted that El Paso "was to perform due diligence to the best they were available [sic] and that's what [it] did."

Richard Schubert, survey supervisor for Gullett, testified that his scope of work on the Project was to "collect all data that was pertinent to mapping the pipeline, whether above ground facilities, an oil well, ... a below ground structure, a pipeline." Schubert testified that he was asked to locate all the foreign crossings that he could locate "strictly with the M-scope." Schubert testified that he did not attempt to find any PVC or fiberglass lines because it was not part of El Paso's instructions. At the close of the Project, El Paso sent Schubert back out to confirm the number and locations of the additional foreign crossings that MasTec had reported to El Paso. Schubert testified that he recorded the GPS location of each foreign crossing. Schubert stated that he also recorded every tie-in because each of the welds must be reported to the Texas Department of Transportation. Schubert testified that there were 274 additional foreign crossings and 126 additional tie-ins. During Schu-

bert's testimony, it was discussed that the alignment sheets Gullett prepared for El Paso to give to the contractors for bidding purposes showed 282 foreign crossings and the as-built drawings Gullett prepared after MasTec completed the Project showed 343 additional foreign crossings–208 of which were metal.

According to Mastec, there were 794 foreign crossings, which required a total of 217 additional tie-ins. The Project was complete in December 2003.

*Communications Concerning the Foreign Crossings*

During construction, in a letter to White from Mark Bounds, Director of Onshore Engineering for El Paso Field Services, dated September 5, 2003, Bounds wrote to confirm that the Project was on track for completion by October 1, 2003, and to confirm that "as of September 1, 2003, there were [sic] no outstanding extra work issues or claims for additional compensation that had not been addressed by EPFS [El Paso Field Services] to MasTec's full satisfaction" and to confirm that "all extra work performed prior to September 1, 2003 has been addressed to MasTec's full satisfaction and included in payments to Contractor authorized to date."

White responded to Bounds, in a letter dated September 8, 2003,

I would like to take this opportunity to bring to your attention some issues that I feel justify discussion for extra compensation to MasTec for costs not covered by the Contract. This letter does not represent any demand by MasTec for payment for extra cost issues at this time. We merely are asking that you take into consideration and review our position related to additional costs beyond our control.

. . . .

Please review the following issues that I feel should be entitled to some compensation, for our cost overrun. Keep in mind that MasTec *does not* feel that EPFS misrepresented any information intentionally, or withheld any information pertinent to bidding this project. We merely feel that circumstances, beyond your control, and ours, has had a cost impact to MasTec worth reviewing.

. . . .

2) *Pipeline Crossing (Foreign Pipelines) O'Connor Ranch*

From [point-to-point] there are approximately 87 pipeline crossings, indicated on the line sheets. During the bidding process, we allowed for a 15% increase in the estimated line crossings to arrive at a cost amount. The final outcome is there are approximately 450–500 pipeline crossings in this area. (We will have documentation with accurate numbers in a few days.) These were mostly all fiberglass lines that no one had any knowledge of. There is a great deal of extra cost associated with ditching and tie-ins . . . .

White testified by deposition at trial that he had not submitted change orders on the additional foreign pipeline crossings because the "problems were still ongoing and we couldn't arrive at a cost" yet. White testified that he had had daily conversations with El Paso because El Paso was concerned, with all of the flooding about the penalties El Paso faced with a third party if the completion deadline was not met.

In a letter to White from Bounds, dated September 26, 2003, Bounds responded that it was El Paso's position that the issues White stated were within MasTec's scope of work. Specifically, with regard to the foreign crossings, Bounds stated,

The fact was well documented that in the project alignment sheets provided to MasTec that [El Paso's] 8–inch Butane Shuttle pipe replacement project was to traverse numerous active and inactive oil and gas producing fields along its entire length. Also, [the specifications] state that [El Paso] will exercise due diligence in locating foreign pipeline crossings but it is [MasTec's] responsibility to confirm all such crossings and contact the owner thereof prior to any excavation. In effect, [El Paso] contracted with [MasTec] to provide this service as part of the pipeline replacement Work and is therefore included in [MasTec's] project Scope of Work as defined in the bid documents. [MasTec's] execution of the construction agreement represented that [MasTec] had fully acquainted itself with the site, including without limitation, the general topography, . . . subsurface conditions, obstructions, and all other conditions pertaining to the Work and made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work, and that anything in the contract or in any representations, statements or information made or furnished by [El Paso] or any of it [sic] representatives notwithstanding, [MasTec] assumed full and complete responsibility for any such conditions pertaining to the Work or its surroundings and all risks in connection therewith.

In a second letter of the same date, Bounds asked White to indicate by signing that all of the change orders, which had been submitted prior to September 1, had been agreed upon. White signed the letter. White testified that there were no outstanding change orders on the foreign crossings because the rains were ongoing, resolution of the foreign pipeline issues was ongoing, and MasTec was completely unable to assign a cost. The testimony at

trial was that, in a check dated on or about this same date, El Paso paid MasTec $48,000 for additional drilling costs associated with the unidentified foreign crossings.

*The Lawsuit*

MasTec sued El Paso for breach of contract and fraud,[7] alleging that El Paso had, during the bidding process, provided MasTec with drawings, specifications, and other materials so that MasTec could evaluate the work and prepare a bid, and that MasTec relied on that information; that El Paso had represented that its existing pipeline was either on top of the ground or buried no more than 12 inches below the ground, but that MasTec had discovered during deconstruction that the majority of the existing pipeline was buried two to five feet below ground level; that the Contract required El Paso to employ due diligence in identifying or marking all foreign crossings, that El Paso had failed to do so, and that El Paso had misrepresented the true number of foreign crossings by 500 percent; that El Paso's employees or agents made promises to surface landowners with respect to services and improvements that went beyond the scope of the Contract and the bid; and that El Paso had refused to issue change orders or to compensate MasTec for any of the additional work. In the alternative, MasTec sought to recover under theories of quantum meruit and quantum valebant. MasTec sought $5.3 million in damages.

The matter was tried to a jury. The jury was asked in Question One of the charge whether El Paso had failed to comply with the contract, and the jury was instructed that it "should consider whether El Paso exercised due diligence in locating foreign pipelines and/or utility line crossings." The jury answered, "Yes." In Question Three, the jury was asked what sum of money would "fairly and reasonably compensate MasTec for its damages, if any, that resulted from El Paso's failure to comply with the contract." The jury was instructed to consider any increased costs incurred by MasTec as a result of unidentified foreign crossings and any consequential lost profits. The jury answered, "$4,763,890." Further, the jury found that MasTec failed to comply with the contract by failing to complete the work required and awarded El Paso $104,687.09 in damages.[8]

Subsequently, El Paso moved to disregard the jury's findings and for judgment notwithstanding the verdict. El Paso asserted that Question One of the jury charge was improperly worded and that "MasTec's own contractual representations and commitments conclusively preclude any recovery in its favor based on this finding." Specifically, El Paso complained,

> Question No. 1 is framed as a breach of contract question and focused on whether [El Paso] had exercised due diligence in locating foreign pipeline and utility line crossings. [El Paso's] efforts to locate these crossings, however, came *before* the construction contract and the representation regarding the crossings were contained **only** in the plans and specifications for the project. Therefore, the contractual provision regarding [El Paso's] "due diligence" did not involve any future performance but at best constituted a warranty.

El Paso contended that MasTec's "Breach of Warranty" claim was precluded under paragraph 8.1(a)(7) of the Contract, under

---

7. The record does not reflect that MasTec pursued its fraud claim.

8. El Paso's counterclaim for $104,687.09 in expenses it claims it incurred for items that were part of MasTec's scope of work is not part of this appeal.

which MasTec was precluded from relying on "any warranty" by El Paso regarding due diligence in locating the foreign pipelines and utility crossings and that MasTec had assumed the associated risks.

El Paso asserted that "[t]he fact that MasTec encountered more underground pipeline crossings than were shown on the drawings was a risk it willingly and openly assumed" and MasTec "has no breach of contract action against [El Paso] on this basis."

The trial court agreed. The trial court found, in pertinent part, as follows:

El Paso Field Services, L.P.[,] moved for judgment on the ground that no jury issue was submitted against it, and the Court is of the opinion that El Paso Field Services, L.P.[,] is entitled to judgment. Therefore, it is ORDERED, ADJUDGED, and DECREED that [MasTec] take nothing against El Paso Field Services, L.P.[9]

[MasTec] filed a motion for entry of judgment on the jury verdict. [El Paso South[10]] filed a motion for entry of judgment ... the Court finds that the Contract at issue in this case between [MasTec] and [El Paso] (admitted into evidence as Defendants' Exhibit 1) is clear and unambiguous. This Contract allocates the risk of any additional cost incurred because of foreign pipeline crossings to [MasTec]. The Court therefore grants [El Paso's] motion (a)

for judgment non obstante verdicto and (b) to disregard certain jury answers. The jury's answers to Questions 1 and 3 in the court's charge are immaterial and are disregarded. It is accordingly ORDERED, ADJUDGED, and DECREED that [MasTec] take nothing against [El Paso] on its claim for additional compensation under the Contract. Because of this ruling, MasTec is not entitled to recover any of its attorneys' fees incurred in the prosecution of its breach of contract claim against [El Paso].

MasTec moved to "vacate, modify, correct, or reform" the judgment and, alternatively, for a new trial. The trial court denied MasTec's motion. This appeal ensued.

**Judgment Notwithstanding the Verdict**

In its sole issue, MasTec contends that the trial court erred by granting JNOV in favor of El Paso.

The jury found that El Paso failed to exercise the due diligence it promised in the Contract with regard to locating underground foreign pipelines. El Paso moved for JNOV on the ground that the jury's finding was immaterial because "Mastec's own contractual representations and commitments conclusively preclude any recovery based on this finding." The trial court agreed, holding that the Contract allocates the risk of any additional

9. Appellees explain in their brief that the parties to the Contract at issue are MasTec, Inc., and Gulfterra South Texas, L.P., f/k/a El Paso South Texas, L.P. MasTec sued El Paso Field Services, L.P., and Gulfterra. Appellees assert that El Paso Field Services, L.P. "was not a party to the contract" and direct us to the final judgment, which states that "no issues were submitted against El Paso Field Services, L.P. and MasTec took nothing from it." El Paso points out that "MasTec assigns no error to that part of the Final Judgment." As such, the issue is not before us. We note,

however, that El Paso Field Services is listed as an appellee in this appeal.

10. Referred to in the judgment as Enterprise South Texas L.P. El Paso explains that the second defendant, Gulfterra, "is now known as Enterprise South Texas, L.P." because the pipeline was sold by an El Paso affiliate to an affiliate of Enterprise Products Corporation. Enterprise is not listed as an appellee in this appeal.

cost incurred because of foreign pipeline crossings to MasTec. On appeal, MasTec contends that the trial court's interpretation of the Contract rendered the due diligence provision a nullity and improperly shifted all the risks associated with those crossings to MasTec. We consider whether the Contract conclusively precludes recovery.

### A. Standard of Review

A trial court may disregard a jury finding and enter a judgment notwithstanding the verdict ("JNOV") if the finding is immaterial or if there is no evidence to support one or more of the jury findings on issues necessary to liability. *See* Tex.R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.). A question is "immaterial" when it should not have been submitted to the jury, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999); *Spencer*, 876 S.W.2d at 157.

When, as here, a trial court specifies the ground upon which it grants a JNOV, an appellant need only challenge the ground relied upon by the trial court. *Voskamp v. Arnoldy*, 749 S.W.2d 113, 118 (Tex.App.-Houston [1st Dist.] 1987, writ denied). However, the appellee may assert on appeal the grounds that it alleged in its motion for JNOV, but that were not relied upon by the trial court, to attempt to vitiate the jury's verdict. Tex.R.App. P. 38.2(b); Tex.R. Civ. P. 324(c); *Voskamp*, 749 S.W.2d at 118.

### B. Governing Principles of Law

In construing a written contract, the primary concern is to ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex.2005). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Id.* at 312. We presume that the parties intended for every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). No single provision is given controlling effect. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003). We give terms their plain, ordinary and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *NationsBank*, 939 S.W.2d at 121. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous, and we construe it as a matter of law. *Id.; Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (holding that "[i]f the contract is unambiguous, the court must enforce the contract as written"). However, if the meaning of the contract remains uncertain or is susceptible to more than one reasonable interpretation, it is ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.

1995); *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983).

Whether a contract is ambiguous is a question of law to be determined "by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker,* 650 S.W.2d at 394. Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520. An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994). A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 445 (Tex.1993).

## C. The Applicable Contract Provisions

MasTec directs us to Specifications LP–5 and LP–17 of the Contract, which it contends specifically address foreign crossings and provide that El Paso "will have exercised due diligence in locating" the crossings, as follows:

2. COMPANY FOREIGN LINE AND UTILITY CROSSINGS

*[El Paso] will have exercised due diligence* in locating foreign pipelines and utility line crossings. However, the contractor shall confirm the location of all such crossings and notify the owner prior to any ditching activity in the vicinity of the crossings....

....

2. FOREIGN LINE AND UTILITY CROSSINGS

*[El Paso] will have exercised due diligence* in locating foreign pipelines and/or utility line crossings. However, the

Contractor shall confirm the location of all such crossings and notify the owner prior to any HDD activity in the vicinity of the crossings. Contractor shall be responsible for all damages to foreign pipelines and/or utility line crossings during HDD operations. Contractor shall repair damaged foreign pipelines and/or utility line crossings to original or better condition and meet Company approval. In all cases, foreign pipelines, utility line crossings and/or structures take precedence over Company tolerances.

Specifications LP–5, –17 (emphasis added).

The plain language of Specifications LP–5 and LP–17 reflects that El Paso made affirmative assurances that it had exercised "due diligence" in locating foreign crossings. The provision further expresses that the parties intended that MasTec "*confirm* the location of all such crossings" prior to actually ditching in the vicinity of those crossings and that MasTec notify each foreign crossing owner prior to digging in the vicinity of their crossing. (Emphasis added.)

We do not find any place within the four corners of the Contract that the term "due diligence" is defined. When a contract term is not defined, it will be given its plain, ordinary, and generally accepted meaning, *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex.1999), unless the instrument shows that the parties used it in a technical or different sense. *NationsBank,* 939 S.W.2d at 121. The Texas Supreme Court has held, "The term 'diligence' is relative and incapable of exact definition. Its meaning must be determined by the circumstances of each case. Reasonable diligence has been defined as such diligence that an ordinarily prudent and diligent person would exercise under similar circumstances.... It is usually a question of fact." *Strickland v. Lake,* 163

Tex. 445, 448, 357 S.W.2d 383, 384 (Tex. 1962); *see Wheeler v. Methodist Hosp.,* 95 S.W.3d 628, 637 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (stating that whether party has exercised "due diligence" is question of fact).

▮▮▮▮ Here, El Paso's assurances that due diligence will have been exercised in locating foreign crossings is reasonably construed as meaning that the steps that an ordinarily prudent and diligent person would exercise under similar circumstances will have been performed. What those steps entail and whether they were performed in this case is a question of fact. *See Strickland,* 163 Tex. at 448, 357 S.W.2d at 384; *Wheeler,* 95 S.W.3d at 637; *see also Oxoco Exploration & Prod. Inc. v. Arrowhead Drilling Corp.,* No. A14–86–181–CV, 1986 WL 11603, at *2 (Tex.App.-Houston [14th Dist.] Oct. 16, 1986, no pet.) (mem. op.) (holding that whether due diligence was exercised in drilling contract was fact issue for jury to resolve under circumstances presented).

▮▮▮▮ Here, the jury found that El Paso failed to "exercise[ ] due diligence in locating foreign pipelines and/or utility line crossings." El Paso moved for JNOV on the grounds that "[t]he fact that MasTec encountered more underground pipeline crossings than were shown on the drawings was a risk it willingly and openly assumed" under the Contract. El Paso directs us to Articles 2.1, 7.1(e), 8.1(a)(7), and to Exhibit B–1.

Article 2.1 states, in relevant part, as follows:

[MasTec] agrees, at its cost, that it shall (except as otherwise provided for in the Contract or Drawings) furnish all necessary materials, supplies, labor, tools, equipment superintendence, apparatus and machinery, including without limitation, transportation and all other items

necessary to perform the Work for the construction and completion. . . .

The plain language of this provision reflects that MasTec promised to furnish, at its cost, the items necessary to perform the work, "except as otherwise." Hence, MasTec's obligation to perform the work for a lump sum is subject to exceptions.

Articles 7.1(e) and 8.1(a)(7) are similar. Article 7.1(e) provides that

[MasTec represents] [t]hat its duly authorized representative has visited the site of the Work, is familiar with the local and special conditions under which the Work is to be performed and has correlated the on site observations with the requirements of the Contract and has fully acquainted itself with the site, including without limitation, the general topography, accessibility, soil structure, subsurface conditions, obstructions and all other conditions pertaining to the Work and has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work, and that anything in this Contract or in any representations, statements or information made or furnished by [El Paso] or any of its representatives notwithstanding, [MasTec] assumes full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings and all risks in connection therewith. . . .

Article 8.1(a)(7) provides that

[MasTec] represents that it has had an opportunity to examine, and has carefully examined, all of the Contract documents and has fully acquainted itself with the Scope of Work, design, availability of materials, existing facilities, the general topography, soil structure, substructure conditions, obstructions, and all other conditions pertaining to the Work, the site of the Work and its sur-

roundings; that it has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work; and that anything in any of the Contract documents or in any representations, statements or information made or furnished by [El Paso] or its representatives notwithstanding, [Mastec] will regardless of any such conditions pertaining to the Work, the site of the Work or its surroundings, complete the Work for the compensation stated in this Contract, and pursuant to the extent of [MasTec's] liability under this Contract, assume full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings, and all risks in connection therewith. In addition thereto, [MasTec] represents that it is fully qualified to do the work in accordance with the terms of this Contract within the time specified.

Articles 7.1(e) and 8.1(a)(7) each provide that MasTec represented that it was "familiar with" or had "fully acquainted itself with" the work and the site. The meaning of the language "is familiar with" and "has fully acquainted itself with," as used in the Contract, is not immediately clear. The plain, ordinary, and generally accepted meaning of the terms "familiar" and "acquainted," however, reflects an intent that a representative of MasTec develop at least some personal knowledge of the work and of the site. *See Parks*, 1 S.W.3d at 101 (stating that terms not defined in contract are given plain, ordinary, and generally accepted meaning). With regard to underground foreign crossings, nothing in this language suggests that the parties intended that MasTec, at the time of contracting, have actually ascertained on its own the number and location of underground foreign crossings along El Paso's 68–mile pipeline corridor.

By contrast, other language in article 8.1(a)(7) specifies that MasTec was to have "carefully examined" all of the Contract documents. The clear intent expressed by this language is that the parties intended to place strong emphasis on that which was contained in "all of the Contract documents." The Contract documents include alignment sheets created by a professional engineering firm, purporting to reflect the number and location of underground foreign crossings, along with express written assurances by El Paso that due diligence was exercised in developing the Specifications it gave to MasTec regarding the number and location of underground foreign crossings.

Both articles 7.1(e) and 8.1(a)(7) provide that MasTec was to have conducted "all investigations essential to a full understanding" of the work. The intent reasonably deduced from this language, when read in light of El Paso's assurances at LP–5 and LP–17 regarding foreign crossings and the professional drawings, is that MasTec was to conduct any remaining investigations that it deemed necessary with regard to formulating its overall understanding of the work. It is not reasonable to conclude that the parties intended that an "essential" investigation include a highly impractical, complete re-investigation of the Specifications El Paso had already provided regarding 68 miles of its own existing *underground* pipeline and corridor. *See Frost Nat'l Bank*, 165 S.W.3d at 312 (stating that "[w]e construe contracts from a utilitarian standpoint, bearing in mind the particular business activity," and avoid unreasonable constructions); *see also Hollerbach v. United States*, 233 U.S. 165, 172, 34 S.Ct. 553, 556, 58 L.Ed. 898 (1914) (stating that owner's specifications regarding character of underground material was matter upon which owner might be presumed to speak with knowledge and authority, and concluding that contractor was

not required to undertake investigation to prove falsity of owner's specifications). Moreover, it is reasonable to conclude that El Paso's assurances would effectively thwart an in-depth re-investigation by MasTec.

This conclusion is supported by other language in Article 7.1(e), which states that MasTec was simply to have "correlated" its "on site observations" with the Contract. (Emphasis added.) The clear intent expressed by this language is that MasTec was to observe the site—that is, to view it by sight—and to compare what it saw with what was provided in the Contract.

Although articles 7.1(e) and 8.1(a)(7) include the terms "substructure conditions" and "obstructions," these provisions do not expressly include underground foreign crossings. By contrast, LP–5 and LP–17, discussed above, contain specific assurances concerning "foreign crossings."

Turning to Exhibit B–1, "Contractor's Proposal," paragraph 1 provides that MasTec agreed to

[f]urnish all labor, equipment and materials as described in the Specifications for all Work necessary to perform the following applicable Work as shown on the Drawings, including but not limited to: loading, hauling, unloading, storing, clearing, excavating, including rock if encountered, cutting and beveling of pipe; installing pipe or valves, where required; removing pipe or valves, where required; welding (including tie-in and transition welds, if required); coating, repairing coating, furnishing and installing padding when applicable; installing concrete supports; blow-offs, bypasses, bolting, bracing hydrostatic testing of completed assemblies, painting of newly installed piping assemblies and cleanup.

The plain language of this paragraph reflects that MasTec's promise to furnish all labor, equipment and materials, specifically with regard to tie-ins, applies to that which is "described in the Specifications" and "shown on the Drawings."

Exhibit B–1 at paragraph 15 provides that

[a]ny Work required to complete installation of the new pipeline but not shown as a pay item is no less included in the scope of work for installation of the new 8–inch Butane Shuttle pipeline and is included in [MasTec's] lump sum proposal. Just because an item of Work is not specifically identified, does not mean such Work is not included in [MasTec's] scope of Work. Any item of Work [MasTec] knows is required for completion of the installation but not specifically identified is to be included in [MasTec's] Lump Sum Proposal.

This paragraph reflects that any item not shown as a pay item "is included in the lump sum proposal," but it is qualified by "[a]ny item of Work *[MasTec] knows is required* for completion...." (Emphasis added.)

So far, articles 2.1, 7.1(e), 8.1(a)(7) and Exhibit B–1, read together and in light of the entire Contract, evidence an intent that MasTec's responsibilities under the Contract with regard to unidentified foreign crossings were to be subject to El Paso's Specifications, Drawings, and assurances under the Contract.

However, articles 7.1(e) and 8.1(a)(7) also provide that, "notwithstanding" any information in the Contract or statements made by El Paso, MasTec "assumes full and complete responsibility" for the site conditions and the associated "risks," and will "complete the work for the lump sum stated in the Contract." This language suggests an attempt by El Paso to disavow its assurances of due diligence at LP–5

and LP–17 and its qualifying language in articles 2.1, 7.1(e), 8.1(a)(7) and Exhibit B–1. No single provision is given such controlling effect. *See Webster*, 128 S.W.3d at 229.

In addition, construing the "notwithstanding" language to require MasTec to disbelieve El Paso's Specifications regarding the number and location of underground crossings, to ignore El Paso's assurances under the Contract that it exercised due diligence in developing its Specifications, and to independently determine, at the time of contracting, El Paso's degree of error along 68 miles of El Paso's own existing underground pipeline is, we think, an unreasonable construction. Again, we construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank*, 165 S.W.3d at 312.

El Paso contends that the caselaw supports construing the "notwithstanding" language in light of the pre-bid-investigation and lump sum provisions of the Contract as placing the risk of differing or unexpected site conditions on MasTec as a matter of law. To the contrary, MasTec contends that the caselaw supports that it is not, by the inclusion of such language, precluded from recovery as a matter of law.

## D. The Risk of Differing or Unexpected Site Conditions

MasTec directs us to *Shintech Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144, (Tex.App.-Houston [14th Dist.] 1985, no writ), and *IT Corporation v. Motco Site Trust Fund*, 903 F.Supp. 1106 (S.D.Tex. 1994).

In *Shintech*, the court allowed a contractor to recover for damages in spite of a site inspection clause and the contractor's assumption of risk under the contract. *Shintech Inc.*, 688 S.W.2d at 151. There, owner Shintech engaged a contractor, Group, to finish an industrial plant expansion. *Id.* at 147. Group submitted a lump sum bid to "furnish all labor, construction services, and supplies necessary," which was accepted. *Id.*

During the project, Shintech allegedly interfered with the efficiency of Group's work. Group sued Shintech, asserting, inter alia, that Group incurred expenses based on Shintech's "*excessive design errors,* changes, and extra work orders." *Id.* at 147–48 (emphasis added). The trial court rendered judgment in favor of Group. *Id.* at 148.

On appeal, the court recognized that a contractor is entitled to recover from an owner for losses due to delay and hindrance of its work if it proves (1) that its work was delayed or hindered, (2) that it suffered damages, and (3) that the owner was responsible for the act or omission that caused the delay or hindrance. *Id.* Shintech complained that, in the contract, Group had assumed the risk of delays and hindrances as follows: "Having fully acquainted itself with the work, the site of the work, its surroundings and all risk in connection therewith, the contractor assumes full and complete responsibility for completing the work for the compensation and within the time provided . . . ." *Id.* at 151 (emphasis omitted). The court rejected Shintech's theory, stating that it found no evidence that Group had knowledge of defective specifications prior to beginning its work. *Id.* In addition, the court found that the *Shintech* contract also provided, "Upsets of [the construction schedule] caused by acts of the client [Shintech] or those over which he controls causing un-

due expense on the contractor [Group] shall be for the owner's [Shintech's] account." *Id.* at 148 (emphasis omitted).

Here, like the contractor in *Shintech,* MasTec agreed to supply all services, labor, and materials necessary under a lump sum contract; MasTec agreed to inspect the site and to assume responsibility for timely completing the work for the agreed compensation; MasTec later discovered excessive errors in the specifications provided by El Paso; and MasTec did not have knowledge of the defective specifications prior to beginning its work. Also, the Contract herein provides at Article 4.6, "COMPENSATION FOR DELAYS IN PERFORMANCE OF WORK," section b, "For delays in the performance of the Work attributable to [El Paso], it is agreed that the compensation and/or amounts due [MasTec] in full and complete settlement of such delays shall be as follows: [various lump sum settlement or reimbursement options]." Hence, there is some evidence in the Contract of intent to allocate to El Paso those expenses that cause MasTec delay and that are attributable to El Paso.

MasTec also directs us to *IT Corporation,* a case from the southern district of Texas. 903 F.Supp. at 1106. There, the Environmental Protection Agency required Monsanto to perform remedial action at Monsanto's hazardous waste site. *Id.* at 1111. Monsanto sent to contractors a request for proposal and scope of work ("bid documents") that included technical data concerning the chemical waste at the site, as prepared by Monsanto's consultants. *Id.* A letter accompanying the bid documents stated that the waste characteristics were "for information only and will not establish the basis for qualifying bids, quantities, methods, compositions, etc. We feel that sufficient information is available to allow a responsible, experienced contractor to provide a lump sum

bid for the service required...." *Id.* at 1117. The bid documents specified that on-site incineration was to be the primary remedial method employed. *Id.* at 1111.

Although the letter accompanying the bid documents stated that the waste characteristics given were for information only, the proposed bid format stated that the information shown in the specifications "shall be used" in determining the lump sum price; that the "data is based upon test results by an independent consultant and is considered reliable"; that the contractor should include a "suitable contingency based upon the contractor's experience"; and that "no cost adjustments will be allowed for surface debris quantities different from those noted." *Id.* at 1117–18.

Contractor ITC visited the site, obtained waste samples, performed limited testing, and submitted its lump-sum bid with a signed statement that it was familiar with the site. *Id.* at 1111. ITC was awarded the contract. *Id.*

The contract defined the scope of work as follows:

The "Work" to be performed by Contractor under this Agreement shall consist of furnishing all personnel, supervision, services, field labor, materials, tools, equipment, supplies and all things required for the necessary design, engineering, construction of facilities and all associated services to properly complete the Remedial Action in strict accordance with the Project Scope of Work....

Contractor shall provide all labor, material, equipment and supervision required to complete the remediation....

*Id.* at 1119. The Scope of Work section in the bid documents and the contract included extensive tables and maps describing the geologic and hydrologic characteristics of the site. *Id.*

During the work, ITC discovered that the waste characteristics were not as Monsanto had specified in the bid documents. *Id.* at 1111–12. ITC notified Monsanto that ITC could not reasonably have discovered the errors until ITC had performed extensive work at the site and that these differences had a drastic impact on efficiency of incineration and costs. *Id.* at 1112. ITC claimed that it could not do the work for the price it bid because the work was not as represented by Monsanto. *Id.* Monsanto refused to consider ITC's claims until ITC completed a "trial burn." *Id.* ITC continued to work under the contract while the parties negotiated. The parties were unable to find compromise, and ITC suspended its work. *Id.*

ITC sued Monsanto for, inter alia, breach of contract, alleging that ITC had been forced to discontinue work because Monsanto had misrepresented the site conditions. The jury returned a verdict in favor of ITC. *Id.*

On appeal, Monsanto contended that any misrepresentation in the bid documents was not a breach of the contract. *Id.* at 1115. The court disagreed, holding that Monsanto had made assertions concerning the characteristics of the waste that were materially false and that ITC, although it had not investigated the accuracies of the characteristics described in the bid documents, was not estopped from asserting a breach of contract claim. *Id.* at 1115–16.

In addition, Monsanto argued that the contract placed the risk of the site conditions on ITC, that ITC had assumed the risk by verifying with its bid that it was familiar with the site conditions, and that ITC was estopped by its investigation from complaining about any misrepresentations in the RFP. *Id.* at 1116. Monsanto further argued that, as a matter of law, the contract placed the risk of differing or unexpected site conditions on the contrac-

tor, required the contractor to investigate the site prior to bidding, and that the contractor directed his own work under the contract. *Id.*

ITC did not dispute that it was required to perform the contract for a lump sum. *Id.* at 1117. ITC asserted, however, that the contract did not require it to bear the risk that the bid documents misrepresented the nature and amount of the work to be performed. *Id.*

The court considered whether, in a lump sum contract in which the contractor has had a right to inspect the site before bidding, the risk that the owner's specifications are inaccurate or inadequate to perform the job falls on the contractor as a matter of law. *Id.* at 1120. The court concluded that it does not. *Id.* at 1126–27.

In *IT Corp.*, as does El Paso in the case before us, the appellee-owner relied on *Lonergan v. San Antonio Loan & Trust Co.*, 101 Tex. 63, 104 S.W. 1061 (1907), and *Emerald Forest Utility District v. Simonsen Construction Co.*, 679 S.W.2d 51 (Tex. App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.), to support its contention that the risk falls on the contractor. *IT Corp.*, 903 F.Supp. at 1120.

In *Lonergan v. San Antonio Loan & Trust Co.*, the Supreme Court of Texas held that a contractor was not excused from performance under a contract to build a house even though the plans and specifications that were prepared by the owner's architect proved to be defective. 101 Tex. 63, 104 S.W. 1061, 1065 (1907). After the nearly completed house collapsed, the contractor abandoned the job, and the owner sued for breach of contract. *Id.* at 1062. The contractor answered that the house collapsed because the plans and specifications were defective. *Id.* The court held that the contractor was not excused from his contractual obligations to

build the house because the owner was not in a better position than the contractor to discover the inadequacies in the plans and there was no express or implied contractual language that would justify a conclusion that the parties intended that the owner be liable. *Id.* at 1066.

In *Emerald Forest Utility District v. Simonsen Construction Company,* the contractor agreed to construct an underground sewer system according to plans furnished by the owner. 679 S.W.2d 51, 52 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.). The instructions to bidders had provided for independent investigation of the work site and stated that the submission of a bid was to be "conclusive evidence" that the contractor was "fully acquainted and satisfied" with the quality and quantity of work. *Id.* at 53. During construction, the contractor encountered "very wet sand conditions." *Id.* at 52. There was testimony that an alternate "wet sand construction method" should have been applied. *Id.* After the contractor completed the work, the sewer lines failed. *Id.* The owner sued the contractor. *Id.* A jury concluded that the lines failed because the design provided by the owner was insufficient. *Id.* The court examined the contract and held that the owner had not expressly or implicitly promised that the plans provided were sufficient for the work. *Id.* at 53.

The *IT Corp.* court, holding in favor of ITC, concluded that the case before it did not present a situation similar to those involved in *Lonergan* or *Emerald Forest* because the contractor did not have the same opportunity or ability as the owner to gather information about the site and to judge the sufficiency of that information before submitting its bid. 903 F.Supp. at 1120–21, 1123.

Here, as in *IT Corp.,* El Paso's bidding instructions provided that "[t]he Contrac-

tor's bid shall be based on the Contract documents as issued, without modification," that "significant exceptions to the provisions of the Proposed Contract documents may cause rejection of the bid," and that "[t]he Scope of Work is believed to be complete." *See id.* at 1111, 1117–18, 1125. As with the contractor in *IT Corp.,* MasTec visited the site, submitted a lump-sum proposal, and represented that it was "familiar" with the site. *See id.* at 1111. Also as the contractor encountered in *IT Corp.,* it was during performance of the work that MasTec discovered the errors in El Paso's specifications and such errors could not reasonably have been discovered until extensive work was performed. *See id.* at 1111–12. Also similarly, MasTec sued El Paso for breach of contract, and the jury returned a verdict in favor of MasTec. *See id.* at 1112–13. Further, similar to the owner in *IT Corp.,* El Paso argues that the contract placed the risk of differing or unexpected site conditions on MasTec, as the contractor, that the contract required MasTec to investigate the site prior to bidding, and that MasTec assumed the risks by representing that it was "familiar" with the site conditions. *See id.* at 1115–16.

As in *IT Corp.,* however, MasTec was not in as good a position as El Paso, as the owner of the Project, to gather critical information concerning underground foreign crossings in El Paso's own pipeline corridor and to judge the sufficiency of the alignment sheets that El Paso provided as a basis for MasTec's bid. El Paso owned the existing pipeline and the easements along the right-of-way, as well as a second pipeline in the same corridor. In addition, El Paso had access to its "one call" catalog, the contact information for area landowners, and the alignment sheets on its other pipeline. Further, the parallel pipeline owned by Valero, which was pur-

chased from El Paso, had alignment sheets showing most of the plastic lines.

Further, as was the court in *IT Corp.*, we are bound by the holding of the United States Supreme Court in *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914), which was decided on similar facts and is cited by MasTec.

In *Hollerbach*, the United States Supreme Court held that the contractor before it was not precluded from recovering his additional expenses when he discovered, during construction, deficiencies in owner-provided specifications in a contract that also required a pre-bid, independent investigation of the jobsite by the contractor. *Id.* at 172, 34 S.Ct. at 556. There, the contractor, Hollerbach, contracted with the government to remove and rebuild a river dam. *Id.* at 167, 34 S.Ct. at 554. The contract specifications provided, inter alia, that "[t]he dam is now backed for about 50 feet with broken stone, sawdust, and sediment to a height of within 2 or 3 feet of the crest, and it is expected that a cofferdam can be constructed with this stone...." *Id.* at 168, 34 S.Ct. at 554. In addition, "[t]he excavation behind the dam will be required to go to the bottom...." *Id.* The contract also provided, "It is expected that each bidder will visit the site of this work, ... and ascertain the nature of the work, the general character of the river as to floods and low water, and obtain the information necessary to enable him to make an intelligent proposal." *Id.* The contract further provided,

It is understood and agreed that the quantities given are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders ... are expected to examine the maps and drawings in this office, which are open to their inspection, to visit the locality of the work, and to make their own estimates of the facilities and difficulties attending the execution of the proposed contract, including local conditions, uncertainty of weather, and all other contingencies.

*Id.* at 167, 34 S.Ct. at 554.

During construction, Hollerbach discovered that the dam was not backed with broken stone, sawdust, and sediment, as stated in the specifications. *Id.* at 168, 34 S.Ct. at 554. Rather, the backing was composed of "soft, slushy sediment" on top and a "cribwork" of "sound logs filled with stone" underneath. *Id.* The trial court refused recovery of the additional expenses Hollerbach incurred to complete the project. *Id.* at 169, 34 S.Ct. at 554.

The Supreme Court reversed, concluding that the specifications assured the contractor of the character of the material—a matter upon which the owner "might be presumed to speak with knowledge and authority." *Id.* at 172, 34 S.Ct. at 556. The Court further explained,

We think this positive statement of the specifications must be taken as true and binding.... We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the [owner] as a basis of the contract left in no doubt. If the [owner] wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification as to the character of the [site].... In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.

*Id.*

Here, like the owners in *IT Corp.* and *Hollerbach*, El Paso made affirmative as-

surances in its Specifications directly bearing on the nature and amount of work to be performed. El Paso wrote into its Contract that due diligence was exercised in locating the foreign crossings on El Paso's alignment sheets—a matter upon which El Paso might be presumed to speak with knowledge and authority. *See Hollerbach,* 233 U.S. at 172, 34 S.Ct. at 556. ("In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity."). As in *Hollerbach,* if El Paso had wished to leave open the matter of foreign crossings to the independent investigation of MasTec, El Paso could have simply left the due diligence provision out of the Contract. *See id.* at 172, 34 S.Ct. at 556.

▮▮▮ In sum, the caselaw demonstrates that a contractor is not precluded, as a matter of law, from recovering against an owner, under a breach of contract theory, for defective specifications, notwithstanding lump-sum and pre-bid investigation provisions in the contract, if the owner was in a better position to know whether its specifications were sufficient for its intended scope of work and the contract evidences that the owner made positive assurances concerning the reliability of those specifications. *See id.* at 172, 34 S.Ct. at 556; *IT Corp.,* 903 F.Supp. at 1120–27.[11] Even when the contract places the risk of differing or unexpected site conditions on the contractor, the contractor is not, as a matter of law, required to bear the risk "that the bid documents mis-

represent the nature and amount of the work to be performed." *See IT Corp.,* 903 F.Supp. at 1125.

Hence, here, MasTec's "own contractual representations and commitments" do not "conclusively preclude any recovery" on the jury's finding that El Paso failed to exercise its promised due diligence under the Contract in locating its underground foreign pipelines. We conclude that the jury's findings in Questions One and Three are not immaterial. *Cf. Tichacek,* 997 S.W.2d at 172 (stating that trial court may disregard jury answer and enter judgment notwithstanding the verdict if jury finding is immaterial). We hold that the trial court erred by granting a JNOV in favor of El Paso.

Accordingly, we sustain MasTec's sole issue.

### CONCLUSION

We hold that the trial court erred by granting judgment notwithstanding the verdict on MasTec's breach of contract claim. We reverse the trial court's judgment as to this claim and remand for entry of judgment consistent with the jury's verdict and for the assessment of attorney's fees in favor of MasTec.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

The majority erroneously reverses the trial court's judgment notwithstanding the verdict rendered in favor of appellee, En-

---

11. MasTec also directs us to *City of Baytown v. Bayshore Constructors, Inc.,* 615 S.W.2d 792 (Tex.Civ.App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.). In *Baytown,* the court concluded that the failure of an owner to provide correct or adequate plans and specifications as are necessary to carry out the work required by a contract constitutes a breach of the contract. *Id.* at 793; *but see Interstate*

*Contracting Corp. v. City of Dallas,* 407 F.3d 708, 720–21 (5th Cir.2005) (concluding that Supreme Court of Texas would require contractual language indicating an intent to shift the burden or risk to owner to find an owner breached contract by providing defective plans and also questioning reasoning in *Bayshore,* which relies on cases in which contracts indicated such intent).

terprise South Texas, L.P., formerly known as El Paso South Texas, L.P. ("El Paso") in the suit of appellant, MasTec, Inc., against El Paso for breach of a contract. Accordingly, I respectfully dissent.

The underlying facts of this case are undisputed. After El Paso had purchased a 68–mile long pipeline that had been constructed in the 1940s, it decided to remove it and construct a new one to carry butane. El Paso solicited bids from several pipeline contractors for the project, which was to be completed within 60 days for a lump-sum price. MasTec then submitted its bid, which was far lower than any other bid made by the other contractors.

In its contract with El Paso, MasTec agreed,

> ... *at its cost,* that it shall (except as otherwise provided for in the Contract or Drawings) furnish all necessary materials, supplies, labor, tools, equipment superintendence, apparatus and machinery, including without limitation, transportation and *all other items necessary to perform the Work* ....

(Emphasis added.) As noted by the majority, MasTec agreed to perform "everything necessary to complete, satisfy, and discharge all Work and obligations imposed on [it] connected with the performance of the Work," including, the following:

> Furnish all labor, equipment and materials as described in the Specifications for all Work necessary to perform the following applicable Work as shown on the Drawings, including but not limited to: loading, hauling, unloading, storing, clearing, excavating, including rock if encountered, cutting and beveling of pipe; installing pipe or valves, where required; removing pipe or valves, where required; welding (including tie-in and transition welds, if required); coating, repairing coating, furnishing and installing padding when applicable;

installing concrete supports; blow-offs, bypasses, bolting, bracing hydrostatic testing of completed assemblies, painting of newly installed piping assemblies and cleanup.

> ....

> *Any Work required to complete installation of the new pipeline but not shown as a pay item is no less included in the scope of work for installation of the new 8–inch Butane Shuttle pipeline and is included in [MasTec's] lump sum proposal. Just because an item of Work is not specifically identified, does not mean such Work is not included in [MasTec's] scope of Work. Any item of Work [MasTec] knows is required for completion of the installation but not specifically identified is to be included in [MasTec's] Lump Sum Proposal.*

(Emphasis added.) In the contract, MasTec represented that

> ... its duly authorized representative has visited the site of the Work, is familiar with the local and special conditions under which the Work is to be performed and has correlated the on site observations with the requirements of the Contract and has fully acquainted itself with the site, including without limitation, the general topography, accessibility, soil structure, subsurface conditions, obstructions and all other conditions pertaining to the Work and has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work, *and that anything in this Contract or in any representations, statements or information made or furnished by [El Paso] or any of its representatives notwithstanding, [MasTec] assumes full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its*

*surroundings and all risks in connection therewith . . .*

(Emphasis added.) MasTec further represented that

... it has had an opportunity to examine, and has carefully examined, all of the Contract documents and has fully acquainted itself with the Scope of Work, design, availability of materials, existing facilities, the general topography, soil structure, substructure conditions, obstructions, and all other conditions pertaining to the Work, the site of the Work and its surroundings; that *it has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work; and that anything in any of the Contract documents or in any representations, statements or information made or furnished by [El Paso] or its representatives notwithstanding, [Mastec] will regardless of any such conditions pertaining to the Work, the site of the Work or its surroundings, complete the Work for the compensation stated in this Contract, and pursuant to the extent of [MasTec's] liability under this Contract, assume full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings, and all risks in connection therewith.* In addition thereto, [MasTec] represents that it is fully qualified to do the work in accordance with the terms of this Contract within the time specified.

(Emphasis added.)

The bottom line is that MasTec, for a lump-sum price, agreed to perform all work necessary to complete construction of the new pipeline. MasTec represented that "notwithstanding" anything in the contract, or any representations made by El Paso, MasTec had "made all investigations essential to a full understanding of the difficulties which may be encountered" in completing the project. Moreover, MasTec assumed "full and complete responsibility" for "all risks" in connection with the project.

In its sole issue to this Court, MasTec contends that the trial court erred in concluding that "the contract shifted the risk of cost associated with unidentified foreign crossings to MasTec." It argues that, despite the above express terms of the lump-sum contract, the trial court erred in granting El Paso's motion for judgment notwithstanding the verdict because "the contract obligated El Paso to 'exercise[ ] due diligence in locating foreign pipelines' before any work began *thereby assuring bidders* like Mastec that the foreign-crossing information El Paso provided was reasonably accurate and reliable." (Emphasis added.)

There are two statements made in two "Construction Specifications" attachments to the contract that El Paso *"will have exercised due diligence in locating foreign pipelines"* and utility line crossings. (Emphasis added.) MasTec and the majority mistakenly label these statements of fact as "due-diligence provisions." MasTec essentially argues that because El Paso did not exercise due diligence in locating such foreign crossings, MasTec incurred considerable unforeseen expenses in completing the project and, thus, El Paso breached the contract by failing to compensate MasTec for these expenses above the agreed upon lump-sum price. The majority agrees with MasTec.

In holding that the trial court erred in rendering its judgment notwithstanding the verdict, the majority concludes that El Paso breached the contract by failing to exercise due diligence in locating foreign crossings and not providing such information to MasTec. The majority reasons that the jury's finding that El Paso

breached the contract was not immaterial because

> ... [A] contractor is not precluded as a matter of law from recovering against an owner, under a breach of contract theory, for defective specifications, notwithstanding lump-sum and pre-bid investigation provisions in the contract, if the owner was in a better position to know whether its specifications were sufficient for its intended scope of work and the contract evidences that the owner made positive assurances concerning the reliability of those specifications.... Even when the contract places the risk of differing or unexpected site conditions on the contractor, the contractor is not, as a matter of law, required to bear a risk that the bid documents misrepresent the nature and amount of the work to be performed.

(citations omitted).

In support of its reasoning, the majority relies upon *Hollerbach v. United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *IT Corporation v. Motco Site Trust Fund,* 903 F.Supp. 1106 (S.D.Tex. 1994); and *Shintech Inc. v. Group Constructors, Inc.,* 688 S.W.2d 144 (Tex.App.-Houston [14th Dist.] 1985, no writ). These cases are simply not applicable because, here, the parties expressly agreed in no uncertain terms that MasTec bore "all risks" of dealing with unanticipated conditions. Such express language, as noted by the court in *IT Corporation,* is controlling:

> [I]f the owner is in a better position than the contractor to assess the site conditions, *and if there is language in the contract that will justify the court in concluding that the parties intended it,* the parties can place on the owner the risk of unexpected site conditions, even in a lump sum contract.

903 F.Supp. at 1127 (emphasis added).

In placing the responsibility for the expenses incurred in working with and around the foreign crossings on El Paso, the majority relies upon the two statements made in the two "Construction Specifications" attachments that El Paso *"will have* exercised due diligence in locating foreign pipelines" and utility line crossings. (Emphasis added.) However, these statements of fact are not "due diligence provisions." El Paso's representations that, prior to the execution of the contract, it "will have" exercised due diligence in locating foreign pipelines cannot be read as imposing any contractual obligation upon El Paso to do anything further to locate foreign pipelines after the execution of the contract by the parties. In fact, El Paso had, prior to soliciting bids, hired a survey company to map the route of the pipeline, and the company tried to locate the foreign crossings. Because detecting underground plastic and fiberglass pipe is virtually impossible, the company could not guarantee the accuracy of its survey. Nor did El Paso. It gave no positive assurance at all regarding the number or location of foreign crossings.

Our primary concern in construing a written contract is to ascertain and give effect to the intent of the parties intentions as expressed in the contract. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005). We must "consider the entire writing and attempt to harmonize and give effect to all of the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Id.* at 312. Also, we must presume that the parties intended for every clause to have some effect. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

Here, El Paso clearly wanted all work on the pipeline project to be performed for a lump-sum price. The contract in no way placed upon El Paso the burden to locate

foreign crossings and provide that information to MasTec. MasTec agreed to perform all work necessary to complete construction of the new pipeline for a lump-sum price. Moreover, MasTec represented that "notwithstanding" anything in the contract, or any representations made by El Paso, MasTec had "made all investigations essential to a full understanding of the difficulties which may be encountered" in completing the project.

Oliver Wendell Holmes warned, "In most contracts men take the risk of events over which they have imperfect or no control." *Ferry v. Ramsey*, 277 U.S. 88, 95, 48 S.Ct. 443, 444, 72 L.Ed. 796 (1928). This admonition is perfectly illustrated by MasTec's assumption of "full and complete responsibility" for "all risks" in connection with the project. I would hold that El Paso did not breach the contract "by failing to exercise due diligence" and that the trial court did not err in rendering its judgment notwithstanding the verdict in favor of El Paso. Accordingly, I would overrule Mastec's sole issue and affirm the judgment of the learned trial judge.