**Opinion issued December 31, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00702-CV**

———————————

**VENABLE'S CONSTRUCTION, INC., Appellant/Cross-Appellee**

**V.**

**ASPEN MIDSTREAM, LLC, Appellee/Cross-Appellant**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-28820**

---

**O P I N I O N**

This construction contract case presents a classic disagreement about pricing.

A pipeline company (Aspen) hired a contractor (Venable's) to build some 56 miles

of 30-inch pipeline from a site in Washington County to a site in Waller County. The

contract set the lump sum price at about $39 million. The contract plainly has some fixed price provisions, with phrases like "Lump Sum," "absolute cap," and "not in addition to the Lump Sum price." But the contract just as plainly contains provisions for extra work, change orders, and unit prices for such additional work.

How much was Aspen required to pay Venable's? Venable's took the position that the project ended up requiring additional footages and efforts beyond what the $39 million lump sum contemplated, so Aspen owed it another $1.77 million. Aspen disagreed about owing the additional amount. This lawsuit followed.

On cross-motions for summary judgment, the trial court sided with Aspen. First, the court rejected the claim for additional compensation. Second, the court agreed with Aspen that Venable's owes a duty to defend an Aspen affiliate in a suit by some Waller County landowners who say the project left the topsoil in disarray and hurt their rice farming. We agree with Aspen about the price issue, but we disagree about the duty to defend Aspen's own affiliate. We therefore do not reach Aspen's conditional cross-appeal concerning objections it made to some of the summary judgment evidence filed by Venable's.

We affirm in part, reverse in part, and remand the issue of attorney's fees under the Declaratory Judgments Act for further proceedings.

**Background**

**A.    Contractual Relationship Between Aspen and Venable's**

In 2018, Aspen decided to install a new pipeline approximately 56 miles in length from Washington County to Waller County. It sought bids from contractors and ultimately accepted the bid from Venable's. In 2019, they signed a written "Master Construction Agreement."

This contract calls for Venable's to do what it calls the "Work" in exchange for a "Lump Sum," but it does considerably more than that. The contract consists of several parts, dozens of sections, and a variety of exhibits.

Part I ("General Terms, Understandings and Obligations of the Parties") runs 3 pages in length and says that Venable's shall perform the Work for a Lump Sum of $39,335,430.35. Part II ("Specific Terms and Conditions") runs 24 pages in length and has 45 sections. Part III ("Instructions and Information to Bidder") deals with the bid process and items such as insurance. Part IV ("Contractor Firm Offer") has two subparts:

- Subpart A, entitled "Lump Sum Price," and

- Subpart B, entitled "Special Unit Prices."

First, the Lump Sum Price in Subpart A reiterates the $39 million figure stated earlier in the contract. Second, the Special Unit Prices in Subpart B provide prices "For Extra Work Only." That is, in the event of "Extra Work," the Special Unit Prices

"shall be used in the event Contractor is required to supply and install Special Unit Items during the execution of Extra Work, pursuant to a change order authorized under Section 11 of Part II of the Agreement." Having briefly described the four parts of the contract, we will examine those parts in greater detail before beginning the legal analysis.

### 1. Contract: Part I

Part I of the contract calls for Venable's to perform the agreed-upon Work and for Aspen to pay Venable's the agreed-upon price. Part 1, section 1 speaks in terms of the "Work described in Exhibit 'A'" but does not define the Work in any further detail. Exhibit A ("Scope of Work") appears later in the agreement.

Part I also contains a price term in section 5:

> **Price**. As total consideration for the Work to be performed hereunder, Company shall pay Contractor a total sum of 39,335,430.35 Dollars ($39,335,430.35) ("Lump Sum")[.] Under no circumstances shall Company be obligated to compensate Contractor beyond the Lump Sum amount set forth in this Part I, Section 5 and the Work Offer attached hereto as Exhibit F.

Section 5 continues by stating that it takes precedence over any conflicting language elsewhere in the contract: "In the event of conflict in the terms of this Part I, Section 5 and any other Part(s) or Exhibits to this Agreement, this Part I Section 5 shall control and be decisive of the issue."

## 2.	**Contract: Part II**

Part II, section 1 lists definitions. It defines "Work" as follows: "'*Work*' as used herein shall mean the doing of all things described in the Scope of Work defined in Part I all in accordance with the terms, conditions, and standards of the Agreement as well as any other additional things as may be necessary to achieve the intent of this Agreement in a timely manner."

Section 6 ("Representations and Warranties") contains a representation by Venable's about the price:

> Contractor's Lump Sum price, as set forth in Section 5 of Part I, is an absolute cap irrespective of any occurrence, error or omissions in drawings or specifications, post agreement increases in materials, delay for right of entry or delivery of materials, any deviations between the issued for bid and/or issued for construction drawings and specifications, hindrance or other cause known or unknown . . . in the amount it will be compensated for completion of the Work hereunder.

Venable's further represents that "under this Lump Sum Agreement, it is assuming all risk associated with the Work and that Contractor's costs to assume such risk are included and reflected in its Lump Sum Price."

Section 11 ("Extra Work – Changes") provides for additional work "which arises outside and is independent or not otherwise included in this Agreement or its scope (hereinafter referred to as 'Extra Work')." Extra Work "may be occasioned by major changes in design or specification regarding Work of both a materially different nature and cost from that contemplated at the time of execution of this

Agreement, or the performance of other or additional Work incident to the completion of the project or facilities here involved, but not in contemplation of the parties at the time of execution of this Agreement."

Section 11 spells out what will not qualify as Extra Work:

Notwithstanding anything contained herein to the contrary, Contractor agrees that any change in the amount of materials or Work of any kind or character as described in Part IV Subparts A and B of this Agreement shall not constitute Extra Work and are included within and not in addition to the Lump Sum price as set forth in Part I, Section 5 of this Agreement.

Section 19 deals with indemnity. As a result, many of its provisions come in bolded capital letters to make them conspicuous, even if not especially easy to read. Among other things, this section provides that Venable's will indemnify, defend, release, and hold harmless Aspen (plus its parent, affiliates, partners, agents, and employees) from any claims alleged to arise out of any breach of the contract by Venable's, or any act or omission as a result of negligence or willful misconduct of Venable's related to the agreement or the performance of the Work. It contains a promise to defend against certain lawsuits by third parties: "This indemnity includes contractor's agreement to pay all costs and expenses of defense, including without limitation reasonable attorneys' fees, incurred by any company indemnitee." (Emphasis omitted.)

Section 43 ("General") states that the agreement "contains the entire agreement between the parties and shall not be modified or supplemented except by

written instrument duly executed by both parties." It also includes a no-waiver clause: "No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided."

### 3. Contract: Parts III and IV

Part III deals with bid proposals, various dates, exhibits, insurance, and other administrative items.

Part IV ("Contractor Firm Offer") begins a 20-page span of text by explaining that it contains two subparts, with Subpart A stating the Lump Sum Price for the Work and Subpart B stating the Special Unit Prices for any Extra Work. "The Lump Sum Price (Subpart A) shall be Bidder's [Venable's] complete bid for all costs to fully complete the unit of Work described. The Special Unit Prices (Subpart B) shall apply to 'Extra Work' not shown on the Drawings nor otherwise required by the Contract Documents in addition to Work contained in the Original Scope of Work to be compensated based upon unit prices."

"Any and all Special Unit items necessary for the completion of Contractor's original scope of work, or implied as necessary for Contractor's successful completion of its original scope of Work under the Agreement are included in Contractor's Lump Sum Price regardless of quantity, known or unknown as of the

7

Effective Date of the Agreement and shall be set forth and included in its Lump Sum Price as referenced in Subpart A."

To the extent that other provisions of the contract bear on the appeal, we will discuss them in the course of examining the legal arguments.

**B.     Payment Dispute**

Construction of the pipeline began in January 2019. By September 2019, Venable's had completed the physical installation of the pipe. Venable's and Aspen then began the "true up" process of determining the actual footage of pipe installed compared to the estimated footage that the parties had included in the contract.

The parties had contemplated in the contract that Venable's would install a total of 298,509 lateral feet of pipeline, with 9,263 lateral feet of pipe installed using bores, a more complicated and expensive method of laying pipe.[1] However, the pipeline had to be re-routed during the construction process, and Venable's ended up installing a total of 299,399 lateral feet of pipeline, with 14,001.2 lateral feet using bores.

---

[1]     A Venable's employee explained that it typically used an "open cut" method of laying pipe, in which workers would excavate a trench, lay and weld the pieces of pipe, and then backfill the trench. In some instances, such as when the pipeline had to cross a road or a stream, Venable's had to drill or bore through the area to lay the pipe. This method "is generally far more difficult and expensive than installing pipe using an open cut method."

It is undisputed that Aspen paid Venable's the Lump Sum Price, plus some additional amounts made through the change order process. However, Venable's was not satisfied with the compensation that it received from Aspen. Venable's believed that because it installed more pipe than anticipated—and, especially, more pipe using bores—it had completed "Extra Work," and it was entitled to compensation for the additional footage at the special unit prices for linear feet of pipe generally and linear feet of pipe installed through bores as specified in Part IV of the contract. Venable's requested that in addition to the Lump Sum, Aspen pay over $1.7 million for the additional footage as Extra Work.

The parties negotiated over this issue. Although Aspen did not dispute that Venable's installed more lateral feet of pipe and used more bores than what the parties had originally estimated, Aspen ultimately determined that Venable's was not entitled to any further compensation under the contract. It therefore refused the demand for additional compensation by Venable's.

## C.    Procedural History

When the parties were unable to resolve the payment dispute, Venable's filed suit. Venable's asserted a claim for breach of contract, alleging that Aspen failed to compensate it for the Extra Work performed in installing the pipeline. It asserted alternative claims for unjust enrichment/quantum meruit and promissory estoppel. Venable's further alleged that Aspen had violated the Prompt Payment Act by failing

to pay Venable's within 35 days of receiving its payment request, and therefore Venable's was entitled to interest on the unpaid amount and attorney's fees. *See* TEX. PROP. CODE §§ 28.002, 28.004, 28.005. Venable's also sought recovery of its attorney's fees under Civil Practice and Remedies Code Chapter 38.

Aspen asserted counterclaims against Venable's, including its own claim for breach of contract arising out of Venable's alleged failure to install the pipeline according to contractual plans and specifications.[2] Aspen also alleged that landowners in Waller County had sued AMP Intrastate Pipeline, LLC, an affiliate of Aspen, for breach of easement agreements and damage to their property allegedly arising out of construction of the pipeline ("the Woods lawsuit"). Aspen sought a declaration that Venable's had a contractual duty to defend and indemnify Aspen and its affiliates for any claims related to the contract.[3] Aspen also requested attorney's fees under both Chapter 38 and the Declaratory Judgments Act.

Following discovery, the parties filed multiple traditional summary judgment motions on the asserted claims:

---

[2] Aspen later non-suited its claim for breach of contract after the trial court made the summary judgment rulings that form the basis for this appeal. Aspen's breach of contract claim is therefore not before us.

[3] Aspen later amended its declaratory judgment counterclaim to request only a declaration concerning the defense obligation of Venable's, not the indemnification obligation. Aspen reserved its right to seek indemnification from Venable's following the conclusion of the Woods lawsuit.

- Aspen moved for partial summary judgment on its declaratory judgment counterclaim, arguing that the petition filed in the Woods lawsuit established that that case fell within the scope of Venable's contractual duty to defend Aspen and its affiliates, including AMP. Aspen later filed an amended summary judgment motion on this claim, but the legal arguments remained the same.

- Aspen also moved for summary judgment on Venable's affirmative claims, arguing that the contract's Lump Sum Price was an "absolute cap" on the amount of compensation Venable's could receive for its "Work" and the additional footage of pipe that Venable's installed did not constitute "Extra Work" that would entitle Venable's to compensation above the Lump Sum Price. It also argued that Venable's could not recover on its alternative claims because an express contract covered all Venable's work on the pipeline project. Aspen further argued that because Venable's had no right to the extra compensation that it sought, the Prompt Payment Act did not apply, and even if it did, the parties' contract fell within that Act's exception for "any well or mine services."

- Venable's moved for partial summary judgment on its breach of contract claim, arguing that the additional footage of pipe and the additional bores constituted "Extra Work," and therefore Aspen should have compensated it for this Extra Work by using the Special Unit Prices contained in the contract to increase the compensation owed to Venable's over the Lump Sum Price that Aspen paid.

- Venable's also moved for partial summary judgment on Aspen's declaratory relief claim, arguing that the Woods lawsuit did not fall within the duty to defend clause because that suit alleged no contractual breaches or noncompliance arising out of any action by Venable's, and even if it had, the duty to defend provision was void and unenforceable under an Insurance Code provision that prohibits construction contractors from requiring an indemnitor to indemnify an indemnitee for a claim caused by the indemnitee's actions.

The parties' summary judgment evidence included their contract, emails relating to the payment dispute, discovery responses, deposition testimony from various employees of Aspen and Venable's, declarations from various employees, the petition in the Woods lawsuit, and letters between the parties' attorneys relating to the Woods lawsuit.

The parties filed responses and replies to the various summary judgment motions. Aspen also objected to some of the evidence that Venable's used to support its motion on its own breach of contract claim. Aspen generally objected to extrinsic evidence relied upon by Venable's, and it raised objections to over thirty statements in the declaration of a Venable's employee and to eleven excerpts from the depositions of two Aspen employees.

The trial court signed three orders relating to the parties' summary judgment motions. The court denied the summary judgment motion that Venable's filed on its own breach of contract claim. In this order, the court struck through a sentence sustaining Aspen's objections to the summary judgment evidence filed by Venable's. In the second order, the court granted Aspen's summary judgment motion on its own declaratory relief counterclaim and declared that Venable's has a duty to defend AMP Intrastate Pipeline in the Woods lawsuit. In the third order, the court granted Aspen's summary judgment motion on the affirmative claims filed by Venable's.

Following these summary judgment rulings, Aspen moved for an award of attorney's fees on its declaratory relief counterclaim. Several months later, after it had non-suited the breach of contract claim against Venable's, Aspen moved for entry of final judgment.

The trial court's final judgment incorporated its three earlier summary judgment rulings. The court rendered judgment for Aspen on "the causes of action and claims for relief asserted by Venable's against Aspen" and ordered that Venable's take nothing on these claims. The court further rendered judgment for Aspen on its declaratory relief claim and ordered that Venable's has a duty to defend AMP in the Woods lawsuit. In a separate order, the court granted Aspen's motion for attorney's fees and awarded Aspen $82,182.50 "for services rendered in association with the prosecution of Aspen's declaratory judgment counterclaim." The court also awarded Aspen conditional appellate attorney's fees.

This appeal and cross-appeal followed.

**Standard of Review**

On cross-motions for summary judgment, each party must establish that it is entitled to judgment as a matter of law. *Hotze v. Turner*, 672 S.W.3d 380, 385 (Tex. 2023); TEX. R. CIV. P. 166a(c). We review the trial court's rulings on the motions de novo, considering both parties' summary judgment evidence. *Mitchell v. MAP Res., Inc.*, 649 S.W.3d 180, 188 (Tex. 2022). When the trial court grants one motion and

13

denies another, we determine all questions presented and render the judgment the trial court should have rendered. *Jordan v. Parker*, 659 S.W.3d 680, 684 (Tex. 2022).

**Pricing Under the Contract**

The first issue on appeal relates to the price Venable's was contractually entitled to be paid. Venable's contends that Aspen breached the contract by underpaying in the amount of $1.77 million. Failing that, Venable's seeks in the alternative to recover in quantum meruit or promissory estoppel. Finally, as an amplifier of its damages, Venable's says that any recovery should be enhanced under the Prompt Payment Act, which applies to this case because this litigation does not fall within the Act's mineral development or oilfield services exemption.[4]

**A.    Breach of Contract**

According to Venable's, it is not claiming compensation over and above the Lump Sum Price for the "Work." Instead, it claims compensation for "installing

---

[4]    *See* TEX. PROP. CODE § 28.002(a) ("If an owner or a person authorized to act on behalf of the owner receives a written payment request from a contractor for an amount that is allowed to the contractor under the contract for properly performed work . . . , the owner shall pay the amount to the contractor, less any amount withheld as authorized by statute, not later than the 35th day after the date the owner receives the request."); *id.* § 28.004(a)–(b) (providing that unpaid amount "required under this chapter" accrues interest beginning on day after date payment is due and bears interest at rate of 1 ½ percent each month); *id.* § 28.010(a)(3) (exempting agreements "to purchase, sell, gather, store, or transport oil, natural gas, natural gas liquids, synthetic gas, or other hydrocarbon substances by pipeline or by a fixed, associated facility").

additional footages, over and above the footages included in the Lump Sum." Venable's says that these additional footages came about only because Aspen called for them: "Aspen directed changes to the route and bores post-Contract." It argues that "Aspen itself directed the performance of the work under a Contract that contains Unit Prices for that work."

Venable's says that digging through dirt costs less than boring through rock: "bores are more expensive to install than baselay installation." Whereas Venable's expected to drill 39 bores, it ended up drilling 47 bores. Further, Venable's expected to install only 298,509.29 feet of baselay but ended up installing 299,399 feet of baselay instead. As damages, Venable's seeks $1,667,846.40 for the additional bores and $104,327.39 for the additional baselay.

Aspen counters that Venable's did Work, but not Extra Work. Aspen further contends that even if Extra Work was done, Venable's still loses because of its failure to follow the contractual protocols for the requisite change orders. To show that Venable's performed only Work and not any Extra Work, Aspen emphasizes Part I, Section 5 and Part II, Section 6(j) of the contract. Those provisions describe the $39 million lump sum figure as a "total sum" and an "absolute cap" on compensation.

Aspen also cites the clause in the Extra Work section of Part II, which says what Extra Work is not: "Notwithstanding anything contained herein to the contrary,

15

Contractor agrees that any change in the amount of materials or Work of any kind or character as described in Part IV Subparts A and B of this Agreement shall not constitute Extra Work and are included within and not in addition to the Lump Sum price."

###    1.    Venable's did Work, but not Extra Work

In light of this "Notwithstanding" clause, as well as the contractual terms concerning Work and Extra Work, we agree with Aspen that the additional footages at issue do not qualify as Extra Work. In Part IV, Subpart A, section 1.0, the contract states that the "work to be performed consists of all activities necessary to complete the installation of approximately 298,509.29 linear feet (56.54 miles)" of 30-inch pipe.

Then the text quickly goes on to identify the starting and ending points. First, it identifies the starting point as Aspen's Battle Horse Facility Launcher Site located in Washington County (and it gives a survey station location). Second, it identifies the ending point as Aspen's Enstore Receiver Site located in Waller County (and it gives a different survey station location). The contract thereby specified what Venable's had to do, just as a passenger does when ordering an Uber to drive him or her from A to B.

Given the "Notwithstanding" clause in Part II—which specifies plainly that Venable's "agrees that any change in the amount of materials or Work of any kind

or character as described in Part IV, Subparts A and B of this Agreement shall not constitute Extra Work and are included within and not in addition to the Lump Sum price"—the installation of pipe to connect point A and point B cannot have constituted Extra Work.

To be Extra Work, that installation of pipe would have to arise outside and be independent of the agreement or its scope. That did not happen. The work here was exactly what the agreement contemplated: Venable's installed pipe to run from point A to point B, from the Washington County site to the Waller County site. Thus, we agree with Aspen that there were no major changes in design or specification requiring work of a materially different nature from that contemplated, and there was no performance of work not contemplated by the parties when they executed the agreement.

Venable's cites considerable extrinsic evidence about who said or did what, but none of that has any bearing on the meaning of this unambiguous contract. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764–65 (Tex. 2018) ("Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument.") (quotation omitted); *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) ("An unambiguous contract will be enforced as written, and parol evidence

will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.") (quotation omitted).

Venable's also contends that if one does the algebra, one can easily show that the lump sum figure comes from multiplying certain unit prices by the linear footage of pipe the parties estimated. Venable's thus reasons that one may readily calculate the right price using the linear footage of pipe actually installed. That may well be so. But the parties agreed to a fixed price scheme for the work. They did not set up an a la carte scheme. In fact, they agreed not to resort to special unit prices unless there was Extra Work, which we have just held was not the case. For these reasons, the contract claim fails.

### 2. The contract as a whole allows no other conclusion

Perhaps the most recent Texas Supreme Court case involving a pricing dispute over a pipeline construction contract is *El Paso Field Services, L.P. v. MasTec North America, Inc.*, 389 S.W.3d 802 (Tex. 2012). There the court enforced a lump sum contract that allocated the risk of underground surprises to the contractor. *Id.* at 812. The court adhered to the venerable rule that where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation when unforeseen difficulties are encountered. *Id.* at 811 (quoting *City of Dallas v. Shortall*, 114 S.W.2d 536, 540 (Tex. 1938)); *see also Lonergan v. San Antonio Loan & Tr. Co.*, 104 S.W. 1061, 1066 (Tex. 1907)

(concluding that absent language in contract, property owner was not "guarantor of the sufficiency of the specifications" for designing and building of structure, and therefore builder bore responsibility for collapse of structure arising out of defects in design specifications by architect).

"Someone has to bear the loss of the additional costs of constructing the pipeline around the undiscovered foreign crossings." *El Paso Field Servs.*, 389 S.W.3d at 811. "Were we to hold in MasTec's favor, and conclude that El Paso must bear the risk of unknown underground obstacles under this contract, we would render meaningless the parties' risk-allocation agreement and ultimately prohibit sophisticated parties from agreeing to allocate risk in construction contracts." *Id.* at 812.

This case bears too close a resemblance to *El Paso Field Services* to allow for any recovery above the Lump Sum Price. Venable's acknowledges that decision but undertakes to distinguish it: "Totally distinct from the Contract here, *El Paso* contains no discussion of Unit Prices." "Unlike the contract in *El Paso*, the Contract here is structured like typical pipeline construction contracts," Venable's contends, "and includes a Lump Sum component in addition to Unit Prices."

This attempted distinction will not survive scrutiny. The contract in *El Paso Field Services* is included among the records of this Court because that case came through this Court on its way to the supreme court. *See MasTec N. Am., Inc. v. El*

19

*Paso Field Servs., L.P.*, 317 S.W.3d 431 (Tex. App.—Houston [1st Dist.] 2010), *rev'd*, 389 S.W.3d 802 (Tex. 2012). Hence, we take judicial notice of that record's contents. *See Tex. Real Est. Comm'n v. Nagle*, 767 S.W.2d 691, 694 (Tex. 1989) ("A court may take judicial notice of its own records and judgments . . . .") (op. on reh'g); *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ) ("[A] court may take judicial notice of its own records."). The contract there did contain unit prices.

Just as the contract in *El Paso Services* put the risk on the contractor to do an adequate inspection before agreeing to a fixed price, the contract here allocates the risk in the same way. Specifically, Part IV contains a representation about site investigation: "The undersigned Contractor represents that it has satisfied itself as to the nature and location of the Work, having in mind in respect of the location of the lines, the risk incident to the possibility or probability of previously undiscovered underground obstacles, the general and local conditions and other factors incidental to the performance of the Work." These factors include "conditions of the terrain" and "all other matters which in any way may affect the Work or the cost thereof." A similar representation about "conditions of the ground" appears in Part I, section 1. The supreme court's decision in *El Paso Field Services* thus controls. Further, and in any event, the contract here resorts to special unit prices only for Extra Work, not for Work.

## B.      Promissory Estoppel and Quantum Meruit

As a fallback, Venable's alleges promissory estoppel and quantum meruit. But a party cannot retread an express contractual bargain through quantum meruit: "A party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished." *Young v. Dimension Homes, Inc.*, No. 01-14-00331-CV, 2016 WL 4536407, at *3 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, no pet.) (mem. op.); *see Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g); *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 70–71 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

The same concept forecloses the promissory estoppel claim. *See Tex. A&M Concrete, LLC v. Brae Burn Constr. Co.*, 651 S.W.3d 607, 621 (Tex. App.—Houston [1st Dist.] 2022, no pet.); *see also Koehler v. Amoco Fed. Credit Union*, No. 01-13-00498-CV, 2014 WL 6602446, at *2 (Tex. App.—Houston [1st Dist.] Nov. 20, 2014, no pet.) (mem. op.) ("[A] promissory-estoppel claim cannot be based upon enforcement of a contract."); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) (op. on reh'g) ("[T]he promissory estoppel doctrine presumes no contract exists . . . .").

We therefore conclude that the trial court did not err by granting Aspen's summary judgment motion on Venable's claims for affirmative relief and denying

the summary judgment motion filed by Venable's on its own breach of contract claim.[5]

We overrule the first issue raised by Venable's.

## Duty to Defend

The next issue on appeal asks whether Venable's owes Aspen a contractual duty to defend an Aspen affiliate in a suit by some local landowners who allege that the pipeline construction project hurt their rice farming. Aspen sought a declaration that Venable's owes such a duty, and the trial court issued one: "Venable's has a duty to defend AMP, Aspen's affiliate, in the Woods Litigation."

---

[5] Because we conclude that the trial court properly granted summary judgment dismissing the breach of contract claim filed by Venable's, we need not address the portion of its first appellate issue concerning its entitlement to recovery under the Prompt Payment Act. That Act presupposes existence of an "unpaid amount." *See id.* § 28.004(a) (providing that "unpaid amount required under this chapter" accrues interest beginning day after date payment is due); *see also id.* § 28.002(a) ("If an owner or a person authorized to act on behalf of the owner receives a written payment request from a contractor *for an amount that is allowed to the contractor under the contract* for properly performed work . . . , the owner shall pay the amount to the contractor, less any amount withheld as authorized by statute, not later than the 35th day after the date the owner receives the request.") (emphasis added). For the reasons discussed above, Venable's is not entitled to any "unpaid amount" under its contract with Aspen.

Similarly, because we conclude that the trial court correctly denied the summary judgment motion filed by Venable's on its breach of contract claim, we need not address the merits of Aspen's conditional cross-appeal, which argues that the trial court should have sustained Aspen's objections to certain evidence submitted by Venable's in support of its summary judgment motion on its breach of contract claim.

Venable's disagrees with the declaration. First, Venable's says that Aspen opted to provide its own defense of the affiliate and never demanded one from anybody else. Second, Venable's says that the promise to defend applies only in the case of alleged wrongdoing by Venable's. Yet the Woods lawsuit blames an Aspen affiliate and never even mentions Venable's. Finally, Venable's says that the Texas Anti-Indemnity Act voids any promise by a construction company to provide indemnity and a defense against wrongdoing by the indemnitee. *See* Tex. Ins. Code § 151.102 ("Except as provided by Section 151.103, a provision in a construction contract . . . is void and unenforceable as against public policy to the extent that it requires an indemnitor to indemnify, hold harmless, or defend a party, including a third party, against a claim caused by the negligence or fault, the breach or violation of a statute, ordinance, governmental regulation, standard, or rule, or the breach of contract of the indemnitee . . . .").

## A. Venable's Promised to Defend and Indemnify in the Event of Certain Claims Alleging a Tort or Breach of Contract

Analysis begins with the text of the contract. Part II, Section 19 contains standard indemnity language. Using the customary capital letters and bold print, subsection 19(A) sets forth promises by the contractor (Venable's) to the company (Aspen), such as indemnity and defense:

> (A) To the fullest extent permitted by law, Contractor agrees to indemnify, defend, release, and hold harmless Company, its parent and affiliate companies . . . from and against any and all

23

claims, demands, losses, damages, causes of action, suits and liabilities of every kind . . . for injury to or death of any person, or for loss or damage (excluding punitive and exemplary) to any property . . . directly or indirectly arising or alleged to arise out of or in any way incidental to (I) any breach or non-compliance with any term or provision of this agreement, by the Contractor . . . ; or (II) any act or omission as a result of negligence or [willful] misconduct, whether active or passive, of the Contractor . . . related to this agreement or the performance or nonperformance of the work hereunder (collectively "Contractor Liabilities"). This indemnity includes Contractor's agreement to pay all costs and expenses of defense . . . .

(Emphasis omitted.) Thus, the contract requires Venable's to provide indemnity and a defense for claims alleging a tort or breach of contract by Venable's, but not for a claim alleging such wrongdoing by Aspen or Aspen's affiliates.

A later subsection provides that Aspen shall give Venable's notice of any such claim. But it adds that Aspen may also opt to provide its own defense, without prejudice to its right to pursue indemnification once the claim is resolved:

(e)     Company shall notify Contractor of any Claim that has given or could give rise to a right of indemnification hereunder . . . . Contractor shall, at its sole cost and expense . . . provide defense for any Claim for which it gives indemnity herein . . . . At Company's sole discretion and option, exercisable at any time, Company may itself undertake the defense . . . of any such Claim, reserving its right to seek indemnification against Contractor until after the Claim is resolved, or Company may direct Contractor to contest, defend, litigate, settle or satisfy any Claim made against Company . . . .

As we will discuss, a third-party claim did arise, and Aspen undertook the defense itself while reserving the right to seek indemnification later.

24

**B. Local Rice Farmers Brought Claims Against an Aspen Affiliate but Not Against Venable's**

The third-party claim came from a handful of rice farmers in Waller County ("the Woods plaintiffs"). In May 2021, they sued an Aspen affiliate known as AMP Intrastate Pipeline in the 506th District Court of Waller County.

The Woods plaintiffs alleged that they had signed some easement agreements with AMP for the purpose of facilitating the pipeline construction project. According to the Woods plaintiffs, the easement agreements contain various promises by AMP about restoring the roads, returning the topsoil to its original condition, and using a digging technique called double-ditching.[6] The Woods plaintiffs allege that AMP broke these promises and caused the loss of farmable acreage. For example, they allege that AMP failed to double-ditch and thus left the ground with too much clay on top to allow for productive rice farming.

The petition in the Woods lawsuit does not mention Venable's.

**C. Aspen Gave Notice of the Woods Lawsuit, Chose to Provide Its Own Defense, and Reserved the Right to Seek Indemnification Later**

A few weeks after the filing of the Woods lawsuit, Aspen brought the lawsuit to the attention of Venable's. An Aspen employee sent a letter that attached the petition and reserved the right to seek indemnification:

---

[6] "Double-ditching" involves removing topsoil from an area of land, removing the subsoil, storing the topsoil and subsoil in separate piles, installing the pipeline, replacing the subsoil first, and then replacing the topsoil.

Second, several landowners have recently sued Aspen's affiliate, AMP Intrastate Pipeline, LLC, in Waller County. Their petition, which I have also attached for your reference, includes claims that relate directly to Venable's work under the Agreement. Under Section 19(A) of the Agreement, Venable's has indemnification obligations covering many of these claims. Aspen reserves the right to seek indemnification from Venable's.

The letter did not ask for a defense.

Aspen followed up a year later in a letter from outside counsel. Aspen reminded Venable's of the Woods lawsuit and reiterated the reservation of the right to seek indemnification after its resolution:

In a letter dated July 8, 2021, Company previously notified Contractor of litigation commenced in Waller County (the "Woods Litigation"). *See* Exs. A, B. Company advised Contractor of indemnification obligations arising under Part II, Section 19(A) of the MCA and specifically reserved the right to seek indemnification from Contractor in the future with respect to the Woods Litigation.

The letter quoted from section 19 of the contract and stated that "[t]he Woods Plaintiffs allege property damage arising from Contractor's breach of or non-compliance with its obligations under the MCA," specifically mentioning the obligation imposed on Venable's to use double-ditching in agricultural fields and wetlands. The letter also repeated Aspen's view about its right to pursue indemnity in the future: "For the avoidance of doubt, Aspen has exercised and is exercising its sole discretion and option to undertake defense of the Claim at issue and reserves its right to seek indemnification from [Venable's], including for the costs of defending such Claim, until after the Claim is resolved."

26

Thus, both Aspen letters reserved the right to seek indemnification when the Woods lawsuit has concluded, but neither letter asked Venable's to provide a defense to that lawsuit.

## D.    The Trial Court's Declaration and Our Holding

This lawsuit began in May 2022, not long before the second Aspen letter about reserving the right to seek indemnification. About a year into this litigation, Aspen filed a counterclaim asking for a declaration about the duty to defend:

> Aspen seeks a declaration that: (i) the Contract requires Venable's to defend AMP in the Woods Litigation, including payment of all costs and expenses of defense (including, without limitation, reasonable attorney's fees incurred or to be incurred by AMP); and (ii) the Contract requires Venable's to indemnify AMP for any and all losses incurred or to be incurred in the Woods Litigation.

The parties teed up this issue on cross-motions for summary judgment. The trial court granted the Aspen motion and denied the Venable's motion, with the final judgment declaring that Venable's has a duty to defend AMP.

On appeal, the parties vigorously debate the eight-corners doctrine and the Texas Anti-Indemnity Act. *See Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 472 (Tex. 2022) ("Under this 'eight-corners' or 'complaint-allegation' rule, the insurer has a duty to defend if the underlying petition alleges facts that fall within the scope of the insurance policy's coverage."); *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 199 (Tex. 2022) ("Under the eight-corners rule, the insurer's duty

27

to defend is determined by comparing the allegations in the plaintiff's petition to the policy provisions, without regard to the truth or falsity of those allegations and without reference to facts otherwise known or ultimately proven."); TEX. INS. CODE § 151.102. But in the runup to those arguments, they clash over the consequences of Aspen opting to provide the defense itself and to reserve the indemnity issue for another day. How does Aspen's choice bear on the Venable's duty to defend?

In our view, Aspen's voluntary choice makes the declaration at issue unsustainable. Aspen never asked for a defense. It never tendered the claim or demanded that Venable's take over the defense. As a result, we see no live dispute needing a declaration as contemplated by the Declaratory Judgments Act. There is only the potential for a future fight over whether Venable's owes any money under the indemnity promise. A declaration now would not "settle and . . . afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b).

Start with the summary judgment motions. Aspen's motion stresses that Aspen wanted a declaration only about defense, not indemnity: "[T]his Motion seeks partial summary judgment *only* on Venable's obligation to *defend* AMP. Under Texas law, the duty to defend and the duty to indemnify are separate and distinct duties." Aspen further argues in its summary judgment reply that a declaration, "if

28

granted, should allow Aspen and AMP to seek reimbursement of defense costs" from Venable's. But that argument lacks merit.

"The duty to defend is determined solely by the precise language in the contract and the factual allegations in the pleadings." *English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also Monroe Guar. Ins. Co.*, 640 S.W.3d at 199 ("The [eight-corners] rule directs Texas courts to determine an insurer's duty to defend its insured based on (1) the pleadings against the insured and (2) the terms of the insurance policy."). The precise language of the parties' contract separates defense and indemnity. The contract puts any reimbursement right under the umbrella of indemnity—"This indemnity includes Contractor's agreement to pay all costs and expenses of defense . . . ."—which Aspen has reserved for later.

Aspen argues that Venable's must "front the costs of the defense, regardless of whether AMP decides to conduct its own defense or have Venable's do so." But the contract says no such thing. The contract creates two possible regimes for who provides the defense, with one calling for fronting of defense costs and the other containing no such clause. This may be easier to see from a comparison of the two relevant sentences in subsection 19(e):

| Sentence 2:<br>Venable's provides a defense at its sole cost and expense | Sentence 3:<br>Aspen can provide a defense, or it can direct Venable's to do so |
|---|---|
| "Contractor shall, at its sole cost and expense, investigate, handle, respond to, and provide defense for any Claim for which it gives indemnity herein, provided that Company shall have the right and opportunity to participate in any such investigation or defense." | "At Company's sole discretion and option, exercisable at any time, Company may itself undertake the defense, litigation, settlement or satisfaction of any such Claim, reserving its right to seek indemnification against Contractor until after the Claim is resolved, or Company may direct Contractor to contest, defend, litigate, settle or satisfy any Claim made against Company, provided that Contractor shall not settle any Claim without Company's prior written consent, such consent not to be unreasonably withheld." |

In the first regime, Venable's provides the defense and pays for it. But Aspen did not choose that regime. Aspen never asked for a defense. Aspen exercised its right under the next sentence to provide the defense itself, and nothing there calls for fronting of defense costs. By opting to provide the defense itself and to reserve indemnity for later, Aspen deferred the issue of defense costs as an item to be dealt with later via indemnification.

After exploring the matter with the parties at oral argument, the Court understands both sides to accept the position advanced by Venable's: the contract "does not provide that Venable's is obligated to assume a defense where Aspen hasn't demanded one. And Aspen did not demand a defense for all the years after

30

the Woods Petition was filed, including when it filed its declaratory judgment counterclaim."

Hence, the trial court's declaration on the duty to defend served no purpose and should not have been rendered. It addressed only a hypothetical set of facts, namely a world in which Aspen demanded a defense and Venable's refused. Such a declaration is improper. *See* TEX. CIV. PRAC. & REM. CODE §§ 37.002(b) (stating that purpose of Declaratory Judgments Act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations"), 37.008 (providing that court may refuse to render declaratory judgment "if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding"). "A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). For a justiciable controversy to exist, there must be "a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Id.* (quotation omitted).

We sustain the second issue raised by Venable's.

**Attorney's Fees Under the Declaratory Judgments Act**

Reversal of the declaration necessarily requires reversal of the trial court's award of attorney's fees. The Act provides for an award of such fees as are equitable

and just. TEX. CIV. PRAC. & REM. CODE § 37.009. But ascertaining whether an award of attorney's fees to Aspen remains equitable and just falls to the trial court in the first instance in light of this opinion. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015); *see also Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 885 (Tex. 2016) ("Where the extent to which a party prevailed has changed on appeal, our practice has been to remand the issue of attorney fees to the trial court for reconsideration of what is equitable and just.").

## Conclusion

We affirm the trial court's take-nothing judgment as to breach of contract, reverse the declaratory judgment as to the duty to defend, and remand the case for further proceedings consistent with this opinion.

David Gunn
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.